UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

| | |
|---|---|
| IN RE:<br><br>MSS, INC.,<br><br>      Debtor.<br>──────────────────────<br>MSS, INC.,<br><br>      Plaintiff,<br><br>    v.<br><br>HUNT ELECTRIC SUPPLY<br>COMPANY,<br><br>      Defendant. | Case No. 23-02487-5-JNC<br>Chapter 11<br><br><br><br><br>Adversary Proceeding<br>No. 25-00045-5-JNC |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

Defendant Hunt Electric Supply Company ("Hunt"), pursuant to Rule 7007-1 of the Local Rules of Practice and Procedure, respectfully submits this memorandum in support of its contemporaneously filed Motion to Dismiss.

**STATEMENT OF THE CASE**

Through its Complaint in this adversary proceeding, Debtor MSS, Inc. ("Plaintiff") seeks to avoid over $2.7 million in payments it made to Hunt in the year before Plaintiff petitioned for bankruptcy. Plaintiff contends that these payments were both preferential and constructively fraudulent. Plaintiff also claims that Hunt tortiously interfered with several of its contracts and violated the North Carolina Unfair and Deceptive Trade Practices Act (the "UDTPA"). On these claims, Plaintiff seeks compensatory, punitive, and trebled damages, plus an award of attorneys' fees. By its present motion, Hunt moves to dismiss all of Plaintiff's claims.

1

WBD (US) 4926-7596-5506

## FACTUAL BACKGROUND[1]

Plaintiff is a construction subcontractor specializing in electrical work. (DE 1 ¶ 2.) Hunt was Plaintiff's nearly-exclusive provider of electrical supplies. (DE 1 ¶¶ 6, 11.) Hunt allowed Plaintiff to purchase the supplies on account. (DE 1 ¶ 13.) Plaintiff ultimately petitioned for bankruptcy on August 28, 2023.

Between September 2022 and July 2023, Hunt received nineteen payments toward Plaintiff's debt (totaling $2,749,405.15)—three payments ($290,053.50) within the ninety-day period before its petition was filed and sixteen payments ($2,459,351.65) between ninety days and one year before the petition. (DE 1 ¶¶ 84–85, 91, 109–11; DE 1-1, at Ex. 3). One of the payments (in the amount of $275,000) was made on July 21, 2023, by the General Contractor of one of Plaintiff's projects, NorthView Construction, LLC. (DE 1 ¶¶ 85, 118; DE 1-1, at Ex. 3). At the time of the transfers, Plaintiff was insolvent, unable to pay debts as they came due, and operating with unreasonably small capital while incurring obligations it could not satisfy. (DE 1 ¶¶ 126, 129–30, 133).

Beginning in 2022, Hunt allegedly concealed from Plaintiff that Plaintiff had exceeded its $1 million credit limit. (DE 1 ¶¶ 13, 32–35.) When Hunt informed Plaintiff of the overdraw in February 2023, it originally misstated the amount due before it provided the accurate figure six days later. (DE 1 ¶¶ 32–35, 37–41, 160(a)–(b)).

On March 7, 2023, Hunt demanded that MSS pay $400,000 within 72 hours "or else," which Plaintiff understood as a threat to put liens on its projects; Hunt thereafter made daily and weekly demands by calls, visits, and other communications. (DE 1 ¶¶ 49, 51–53, 58–59, 76(a)).

---

[1]     For the purposes of this motion, the well-pleaded factual allegations of Plaintiff's Complaint are treated as if they were true.

WBD (US) 4926-7596-5506

Partial payments tendered by Plaintiff were applied by Hunt to the oldest invoices first. (DE 1 ¶ 61.) Hunt refused Plaintiff's request for a deferred payment schedule. (DE 1 ¶¶ 63, 65, 69.) Hunt threatened to cancel outstanding unpaid orders, switched Plaintiff to cash-on-delivery terms, and refused to deliver materials for which payment had not been received. (DE 1 ¶¶ 42, 55–56, 76(c)–(d), 79.)

Hunt ultimately contacted the General Contractors for payment and filed mechanics' liens and claims of lien on funds. (DE 1 ¶¶ 73, 76(b)–(e), 85, 88, 145, 151.) Plaintiff asserts Hunt made unspecified "false and misleading" statements to certain general contractors, including T.D.K. Construction Co., about Plaintiff's ordering and indebtedness. (DE 1 ¶¶ 77, 83, 160(a).) These communications and liens precipitated defaults and terminations of some of Plaintiff's construction subcontracts. (DE 1 ¶¶ 73, 76(b)–(e), 85, 88, 145, 151.)

## ARGUMENT

Each of Plaintiff's claims fails to state a claim upon which relief could be granted. As a result, this adversary proceeding should be dismissed.

### I.     Standard

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, which is incorporated by Bankruptcy Rule 7012, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). The *Iqbal–Twombly* plausibility standard requires this Court to engage in a two-step analysis. *Id.* at 678–79 (citing *Twombly*, 550 U.S. 544, 555–56).

First, the Court should identify and discard all allegations that cannot be accepted as true. *Id.* at 678; *Twombly*, 550 U.S. at 555. Courts should ignore allegations that are "merely conclusory,

WBD (US) 4926-7596-5506

unwarranted deductions of fact, or unreasonable inferences." *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002). Courts should also reject factual allegations that are contradicted by documents attached to and incorporated into the complaint. *See, e.g.*, *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013) ("In the event of conflict between the bare allegations of the complaint and any exhibit attached to the complaint, the exhibit prevails." (cleaned up)).

Next, the Court should assume the truth of well-pleaded factual allegations—if any—and determine, by drawing on "its judicial experience and common sense," whether these well-pleaded allegations are enough to move the claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570; *see also Iqbal*, 556 U.S. at 679. A claim is plausible when the *factual* content pleaded by the plaintiff "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" under the applicable substantive law. *See Iqbal*, 556 U.S. at 678.

## II.      Plaintiff's Preference Claim Fails

Plaintiff claims that all payments it made to Hunt in the year before filing its bankruptcy petition should be avoided as preferences under Section 547 of the Bankruptcy Code. Its claim falls short for two reasons. First, the Complaint does not plausibly allege that Hunt is an insider, and thus Plaintiff is incorrectly applying a one-year lookback period instead of the proper ninety-day lookback period. Second, Plaintiff fails to show that the transfer from NorthView Construction, LLC ("NVC") to Hunt affected Plaintiff's property and entitled Hunt to receive more than it would in a chapter 7 liquidation.

### A.  Plaintiff did not plausibly allege that Hunt is a non-statutory insider

Plaintiff alleges that, while it was insolvent and shortly before it petitioned for bankruptcy, nineteen transfers were made in payment of Plaintiff's antecedent debt to Hunt (the "Transfers").

4

(DE 1 ¶¶ 84–85, 91, 109–11; DE 1-1, at Ex. 3.) Specifically, Plaintiff alleges that three Transfers (totaling $290,053.50) took place within the ninety-day period before the petition, and an additional sixteen transfers (totaling $2,459,351.65) occurred in the period between ninety days and one year before the petition. (DE 1-1, at Ex. 3.) Plaintiff contends that the one-year lookback is appropriate under Section 547(4)(B) because Hunt is, supposedly, an "insider" of Plaintiff. (DE 1 ¶¶ 100, 106.) Plaintiff is mistaken.

A debtor in possession may "avoid any transfer of an interest of the debtor in property" if the transfer prefers one creditor over others and was:

> **(1)** to or for the benefit of a creditor;
> **(2)** for or on account of an antecedent debt owed by the debtor before such transfer was made;
> **(3)** made while the debtor was insolvent;
> **(4)** made--
> **(A)** on or within 90 days before the date of the filing of the petition; or
> **(B)** between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
> **(5)** that enables such creditor to receive more than such creditor would receive if –
>> **(A)** the case were a case under chapter 7 of this title;
>> **(B)** the transfer had not been made; and
>> **(C)** such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547; 11 U.S.C. § 1107 (bestowing upon a debtor in possession certain powers of a trustee). The debtor in possession has the burden of establishing each element of a preference action under Section 547. 11 U.S.C. § 547(g).

The Bankruptcy Code defines "insider" to include several categories of people and entities, including a company's directors and officers. 11 U.S.C. § 101(31)(B). The defined list, however, is not exhaustive. *Id.* (stating that the definition merely "includes" the identified categories). "By defining an 'insider' as a non-exhaustive list of entities, § 101(31) 'creates (but does not define)

5

what is known as a non[-]statutory insider.'" *Angell v. Meherrin Agric. & Chem. Co.* (*In re Tanglewood Farms, Inc. of Elizabeth City)*, 10-06719-8-JRL, 2013 WL 1829910, at \*14 (Bankr. E.D.N.C. May 1, 2013) (quoting *Lynch v. Winslow* (*In re Winslow)*, 473 B.R. 94, 101 (E.D.N.C. 2012)). To establish non-statutory insider status, the trustee or debtor in possession must allege facts plausibly showing that "the alleged insider . . . exercise[d] sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets." *See Butler v. David Shaw, Inc.*, 72 F.3d 437, 443 (4th Cir. 1996). In short, the Fourth Circuit has expressly held that some degree of actual operational control is required before an entity becomes a non-statutory insider.

This standard is quite high. *E.g., Smith v. Porter*, 416 B.R. 264, 270 (E.D. Va. 2009) ("The relationship must involve considerable control on the part of the alleged insider"); *Smith v. Porter* (*In re Carr & Porter, LLC)*, 416 B.R. 239, 256 (Bankr. E.D. Va.) (holding that even a "manager" is not a non-statutory insider if he cannot, in fact, make decisions about the company's operations), *aff'd sub nom. Porter*, 416 B.R. at 270.

In the debtor–creditor context, insiders are rare: "for a creditor to 'control' a debtor so as to be considered an 'insider,' the creditor must be so powerful that the debtor becomes a mere instrument or agent of the creditor, unable to make independent policy and personnel decisions." *Principal Mutual Ins. Co. v. Lakeside Associates, L.P. (In re DeLuca)*, 194 B.R. 797, 804 (Bankr. E.D. Va. 1996) (emphasis added) (quoting *In re Krisch Realty Assocs., L.P.*, 174 B.R. 914, 920 (Bankr. W. D.Va.1994)); *Hornberger v. Davis Cedillo & Mendoza, Inc. (In re Olmos Equip., Inc.)*, 601 B.R. 412, 426 (Bankr. W.D. Tex. 2019) (creditor lacked control and influence over the debtor such that the transaction was not at arm's length). A creditor is never an insider merely because it can exercise financial power or control as an incident of the debtor–creditor relationship. *See, e.g.,*

6

*In re Newcomb*, 744 F.2d 621, 625 n.4 (8th Cir. 1984); *Johnson v. NBD Park Ridge Bank (In re Octagon Roofing)*, 124 B.R. 522, 530 (Bankr. N.D. Ill. 1991); *Practical Inv. Corp. v. Rellen (In re Practical Inv. Corp.)*, 95 B.R. 935, 941 (Bankr. E.D. Va. 1989); *Schick Oil & Gas, Inc. v. Fed. Deposit Ins. Corp. (In re Schick Oil & Gas, Inc.)*, 35 B.R. 282, 285–86 (Bankr. W.D. Okla. 1983); *see also Tanglewood Farms*, 2013 WL 1829910, at *15 (financing relationship alone is insufficient to create a non-statutory insider relationship).

In other words, when a creditor has nothing but the power to compel or secure payment—no matter how painful the exercise of that power may be to the debtor—the debtor "retain[s] ultimate control of [its] destiny." *See Clark v. Balcor Real Estate Fin., Inc. (In re Meridith Millard Partners)*, 145 B.R. 682, 688 (D. Colo. 1992), *aff'd sub nom. In re Meridith Hoffman Partners*, 12 F.3d 1549 (10th Cir. 1993). If a debtor can decide to rid itself of the creditor's "control" simply by paying off the debt, the creditor is not an insider. *See, e.g., LW-SP2, L.P. v. Krisch Realty Associates, L.P. (In re Krisch Realty Associates, L.P.)*, 174 B.R. 914, 920 (Bankr. W.D. Va. 1994) (holding that creditor was not an insider because "[t]he debtor could find another lending institution, pay off the loan, and terminate the relationship at any time."); *Markowitz v. Heritage Bank, N.A. (In re Jefferson Mortg. Co., Inc.)*, 25 B.R. 963, 970 (Bankr. D.N.J. 1982) (creditor was not an insider when "debtor could have terminated the relationship at any time and looked for another creditor").

In this case, Plaintiff does not allege that Hunt qualifies as an insider under any of the express categories outlined in the statute. Thus the $2.75 million question becomes whether Plaintiff has adequately alleged that Hunt has enough control over Plaintiff's decision-making to qualify as a non-statutory insider. In support of its insider assertion, Plaintiff argues that: (1) Hunt enjoyed a "one-sided relationship" with Plaintiff, (2) Hunt possessed "indirect control" and

7

WBD (US) 4926-7596-5506

"influence" over the Plaintiff's business operations, financial affairs and decision-making because of its alleged stranglehold on Plaintiff's finances, and (3) Hunt took advantage of Plaintiff's "complete dependency" on Hunt to "exercise[ ] a level of coercion, control, and influence" that compelled Plaintiff to pay a substantial sum it ultimately could not afford. (DE 1 ¶¶ 100, 106–07.) In a word, Plaintiff alleges that Hunt, as its sole supplier and most significant creditor, had the power to put Plaintiff out of business by collecting its debts and refusing to continue its business relationship with Plaintiff. (DE 1 ¶¶ 53–54, 62, 69, 71–73.) Even if these factual allegations were true, however, they are not enough as a matter of law. All of the "control" exerted by Hunt was incidental to its rights, as creditor, to demand payment. Notably, Plaintiff does not allege that Hunt could somehow direct Plaintiff's operational decision-making, such as by dictating which construction projects to work on, which employees to hire or fire, or which supplies to purchase. *Cf. In re Winstar Communications, Inc.*, 554 F.3d 382, 399 (3d Cir. 2009) (holding, under the Third Circuit's less stringent standard, that a creditor was a non-statutory insider when it had operational control over the debtor's projects and could force the debtor to buy products it did not need from the creditor).

Because Plaintiff has failed to plead sufficient facts to show that Hunt is a non-statutory insider, the Court should dismiss its claims that transfers predating May 30, 2023 (*i.e.*, ninety days before the petition date) should be avoided as preferential.

**B.  Plaintiff did not plausibly allege that the transfer from NorthView Construction diminished the bankruptcy estate or entitled Hunt to more than it would otherwise be entitled in a chapter 7 case**

Within the proper, ninety-day preference period, Plaintiff alleges that the largest payment, a payment from NVC to Hunt on July 21, 2023, in the amount of $275,000, is avoidable because

WBD (US) 4926-7596-5506

it "represented amounts that were due and owing to MSS[ ] pursuant to the NVC Construction Contract[.]" (DE 1 ¶¶ 85, 118, DE 1-1, at Ex. 3.) Again, Plaintiff's legal assumptions are incorrect.

Under the Bankruptcy Code, only transfers "of an interest *of the debtor* in property" and those that enable a creditor to receive more than it would in a chapter 7 case are avoidable as preferences. 11 U.S.C. § 547(b). A debtor has an interest in property "only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold." *Begier v. I.R.S.*, 496 U.S. 53, 59 (1990) (applying the analogous definition of "property of the estate" under 11 U.S.C. 541(d)). Relatedly, a transfer can be avoided as a preference only if the debtor in possession can show that the transfer diminished the ultimate value of the bankruptcy estate or enabled a creditor to receive payment of a greater percentage of its claim than he would have received had the transfer not been made. *See In re Virginia-Carolina Fin. Corp.*, 954 F.2d 193, 199 (4th Cir. 1992) (applying 11 U.S.C. § 547(b)(5)); *Committee of Creditors v. Koch Oil Co. (In re Powerine Oil Co.)*, 59 F.3d 969, 972, 33 C.B.C.2d 1778 (9th Cir. 1995). The Fourth Circuit acknowledged "th[is] common sense notion that a creditor need not return a sum received from the debtor prior to bankruptcy if the creditor is no better off vis-à-vis the other creditors of the bankruptcy estate than he or she would have been had the creditor waited for liquidation and distribution of the assets of the estate." *Hager v. Gibson (In re Hager)*, 109 F.3d 201, 210 (4th Cir. 1997). Unlike payments to unsecured creditors, secured creditors will typically meet this condition of Section 547(b) where payments are made out of its collateral that would otherwise be received in a chapter 7 case. *Id.* Because liens typically pass through bankruptcy unaffected, any transfer by a third party of property fully encumbered by a lien does not diminish the debtor's property and cannot be avoided as a preference. *See, e.g., In re Wilkinson*, 196 B.R.

9

311, 320 (Bankr. E.D. Va. 1996); *cf. Cooper v. Grisofe Electric Corp. (In re Bldg. Dynamics, Inc.)*, 134 B.R. 715, 717 (Bankr. W.D.N.Y. 1992) (payment by a debtor–contractor to a subcontractor of funds held in a constructive trust analogous to a mechanic's lien is not "property of the debtor" for purposes of preference statute); *Cen-Pen Corp. v. Hanson*, 58 F.3d 89, 92 (4th Cir. 1995) (liens pass through bankruptcy).

In this case, Hunt properly filed its claim of lien on funds on July 10, 2023, attaching its lien to all the funds NVC owed to Plaintiff. Exhibit A.[2, 3]  As a result, when the NVC payment was made on July 21, 2023, Plaintiff had no equitable interest in the funds transferred from NVC.  This was simply a payment to Hunt on its secured claim made from its collateral. Hunt's lien had already attached to the funds owed to Plaintiff and entitled Hunt to these funds regardless of when they were paid.  It neither diminished the estate vis-à-vis other creditors nor gave Hunt more than it would have received in a hypothetical liquidation in a Chapter 7 case.  Because the Transfer from NVC to Hunt did not, as a matter of law, diminish Plaintiff's property, it cannot be a preference.

---

[2]   The Court may consider this attachment even in this motion-to-dismiss posture. *E.g.*, *Sec'y of State For Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) ("we may consider documents . . . attached to the motion to dismiss, so long as they are integral to the complaint and authentic."). Plaintiff's other claims depend, in part, on its express allegations that Hunt filed and asserted liens on the funds against the General Contractors, including NVC, which caused payments to be made to Hunt instead of MSS. (DE 1 ¶ 76(e).) Because the existence of Exhibit A gives rise, in part, to the legal rights Plaintiff asserts elsewhere in the complaint, it is integral to the Complaint and properly considered in this motion to dismiss. *E.g.*, *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) ("An integral document is a document that by its very existence, and not the mere information it contains, gives rise to the legal rights asserted." (cleaned up)).

[3]   Plaintiff's general and threadbare recital that "Defendant had not exercised or asserted any of its lien rights [as of the Transfer date]," (DE 1 ¶ 88), is plainly incorrect in light of Exhibit A. The Court should disregard the Plaintiff's inaccurate summarization of the document. *S. Walk at Broadlands*, 713 F.3d 175 at 182.

10

Accordingly, Plaintiff's claim should be dismissed to the extent it seeks to avoid the NVC Transfer as a preference.

### III.      Plaintiff's Constructive Fraud Claims Fail

Plaintiff claims, in the alternative, that the Transfers should be avoided as constructively fraudulent. At the time the Transfers were made, Plaintiff alleges, Plaintiff was insolvent, was unable to pay its debts as they came due, had substantial past due obligations, was engaged in a business for which any of its remaining capital was unreasonably small, and believed it would incur debts and obligations beyond its ability to pay. (DE 1 ¶¶ 126, 129, 130, 133.) Plaintiff baldly concludes that it did not receive reasonably equivalent value in exchange for the Transfers "to the extent that [Plaintiff] did not receive or otherwise benefit from any of the materials that were purchased from Defendant and furnished to the Construction Projects." (DE 1 ¶¶ 127–28.) As a result, Plaintiff contends that the Transfers are avoidable under both Section 548 of the Bankruptcy Code and the North Carolina Uniform Voidable Transfer Act under Section 544. (DE 1 ¶ 135–36.) Because Plaintiff's legal conclusions regarding reasonably equivalent value are belied by its own factual allegations, however, Plaintiff fails to state a claim.[4]

Constructively fraudulent transfers can be avoided only if the debtor received less than "reasonably equivalent value" in exchange for the transfer. 11 U.S.C. § 548(a)(1)(B)(i); N.C. Gen. Stat. § 39-23.4(a)(2). In this context, "value" expressly includes the satisfaction of antecedent debt. 11 U.S.C. § 548(d)(1)(A); N.C. Gen. Stat. § 39–23.3; *see also* 5 Collier on Bankruptcy P 548.05 (16th 2025) ("Transactions that satisfy, discharge or secure all or part of an otherwise legitimate

---

[4]      For the same reasons as explained above, the constructively fraudulent transfer claims also fail with regard to the NVC Transfer because that Transfer did not involve property of the debtor.

obligation are for 'value'"). In considering whether reasonably equivalent value has been given "the proper focus is on the net effect of the transfers on the debtor's estate . . . . As long as the unsecured creditors are no worse off because the debtor, and consequently the estate, has received an amount reasonably equivalent to what it paid, no fraudulent transfer has occurred." *Harman v. First Am. Bank of Maryland* (*In re Jeffrey Bigelow Design Group, Inc.*), 956 F.2d 479, 484 (4th Cir. 1992); *see also Estate of Hurst ex rel. Cherry v. Jones*, 230 N.C. App. 162, 169, 750 S.E.2d 14, 19–20 (2013). As a result, if a transfer reduces a debtor's preexisting debt dollar-for-dollar, reasonably equivalent value exists as a matter of law. *E.g.*, *Cook, Tr. for Yahweh Ctr., Inc. v. United States*, 637 B.R. 802, 810–11 (E.D.N.C. 2020) (*citing In re Southeast Waffles, LLC*, 702 F.3d 850, 857 (6th Cir. 2012) and *Miller v. First Bank*, 206 N.C. App. 166, 178, 696 S.E.2d 824, 832 (2010)), *aff'd sub nom. In re Yahweh Ctr., Inc.*, 27 F.4th 960 (4th Cir. 2022); *see also, e.g.*, *Peterson v. Capital One N.A. (In re Mack Indus., Ltd.)*, 2020 WL 6708874, at *4 (Bankr. N.D. Ill. Nov. 16, 2020) (collecting cases unanimously supporting the proposition that "[a] debtor always receives reasonably equivalent value when it repays its own antecedent debt.")

Plaintiff's allegations clearly show that each of the Transfers was made to pay down Plaintiff's antecedent debts to Hunt. (DE 1 ¶¶ 11–13, 18–19, 26, 32, 34, 36, 39–42, 44, 48–49, 54, 60, 61, 63, 65, 67–69, 84.) In essence, Plaintiff has alleged that the assets flowing out of its coffers were offset, dollar-for-dollar, by a reduction in Plaintiff's liabilities. As an uncontroversial matter of law, therefore, the Transfers were each made for reasonably equivalent value. Consequently, Plaintiff has failed to plead a cause of action for constructive fraud.

Notably, Plaintiff does not seek to avoid the underlying transactions, in which Plaintiff incurred the debt in exchange for Hunt's provision of electrical supplies. Plaintiff merely concludes that it did not receive reasonably equivalent value for the Transfers "to the extent" the materials it

WBD (US) 4926-7596-5506

procured in the unchallenged, *underlying* transactions ultimately proved to be less valuable to Plaintiff than anticipated—presumably because it had already furnished the supplies to the Construction Projects before the contracts were terminated. (DE 1 ¶ 127.) Plaintiff's conclusion is ill-founded for several reasons. First, it improperly conflates two different sets of reciprocal transfers: the original debt-for-supplies transactions and the later cash-for-debt-reduction transactions. Second, even if Plaintiff had challenged the legitimacy of the underlying transactions, Plaintiff appears to misunderstand the timing requirements. "The date for defining such reasonable equivalence is the date of the transfer . . . . Neither subsequent depreciation in nor appreciation in value of the consideration affects the value question whether reasonable equivalent value was given." *In re Morris Communications NC, Inc.*, 914 F.2d 458, 466 (4th Cir. 1990). Because Plaintiff has not alleged that the obligations it incurred were not reasonably equivalent to the value of the electrical supplies *at the time those supplies were ordered*, it has failed to allege a lack of reasonably equivalent value.

Without allegations plausibly showing that reasonably equivalent value was lacking, Plaintiff's constructive fraud claims should be dismissed.[5]

## IV.   Plaintiff's Tortious Interference Claim Fails

Plaintiff claims that it is entitled to compensatory and punitive damages for Hunt's supposedly tortious "interference" with Plaintiff's contracts with the General Contractors related to the Construction Projects. Specifically, Plaintiff alleges that Hunt knew that its continued supply of materials was necessary for Plaintiff to service the Construction Projects, (DE 1 ¶¶ 49, 71–72,

---

[5]   Because Plaintiff's attempts to avoid the Transfers as preferences or for constructive fraud all fail, Plaintiff's attempt to impose a judgment for the avoided transfers under Section 550 is moot and should also be dismissed.

WBD (US) 4926-7596-5506

74, 76(c)), and that any attempt to seek payment from the General Contractors or place liens against the Construction Projects would cause Plaintiff to default under the Construction Contracts. (DE 1 ¶¶ 53, 70.) Nevertheless, according to Plaintiff, Hunt demanded payment from the General Contractors, asserted liens against them, and threatened to stop providing supplies if Hunt was not paid. (DE 1 ¶¶ 73, 76(b)–(e), 145.) Plaintiff concludes that Hunt's only possible justification for pursuing payment from the General Contractors was to "cripple the business operations of [Plaintiff]" and to "cause significant damage to [Plaintiff], financially and professionally, within the construction industry." (DE 1 ¶¶ 78, 80.) All told, however, Plaintiff's allegations fall short of stating a claim.

> To state a tortious interference claim, a plaintiff's factual allegations must plausibly show
>
> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 368 N.C. 693, 700, 784 S.E.2d 457, 462 (2016) (citing *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988)). Inducement is the "act or process of enticing or persuading another person to take a certain course of action. INDUCEMENT, Black's Law Dictionary (12th ed. 2024). "A person acts intentionally if he desires to cause the consequences of his act or [if] he believes the consequences are substantially certain to result." *State v. Bright,* 78 N.C. App. 239, 243, 337 S.E.2d 87, 89 (1985), *disc. rev. denied,* 315 N.C. 591, 341 S.E.2d 31 (1986); *see also Jones v. Willamette Indus., Inc.*, 120 N.C. App. 591, 594, 463 S.E.2d 294, 297 (1995).

"In order to demonstrate the element of acting without justification, the action must indicate no motive for interference other than malice." *Area Landscaping, L.L.C. v. Glaxo-*

14

*Wellcome, Inc.*, 160 N.C. App. 520, 523, 586 S.E.2d 507, 510 (2003) (quotation marks removed); *see also Peoples Sec. Life Ins. Co. v. Hooks*, 322 N.C. 216, 220–21, 367 S.E.2d 647, 650 (1988) ("If the defendant's *only* motive is a malicious wish to injure the plaintiff, his actions are not justified." (emphasis added)). When factual allegations reveal any possible justification or a motive other than malice, the complaint should be dismissed. *E.g., Hooks*, 322 N.C. at 220–21; *Filmar Racing, Inc. v. Stewart*, 141 N.C. App. 668, 675, 541 S.E.2d 733, 738 (2001). This is true even when the plaintiff baldly alleges that the defendant "lacked justification." *Id.*; *see also Webb v. Royal Am. Co.*, 06-CVS-4626, 2008 NCBC LEXIS 44, *14 (N.C. Super. Mar. 17, 2008) ("It is just common sense that where a business justification appears on the face of a complaint, the plaintiff may not avoid application of the justification by making allegations of a legal conclusion that the claim was without justification."). A lender acts with a "proper business justification" when it attempts to collect its debts, even by informal means. *Reeve & Associates, Inc. v. United Carolina Bank*, 96 CVS 4695, 1997 WL 33446634, at *4 (N.C. Super. Oct. 6, 1997).

In this case, Plaintiff's tortious interference claim fails for two reasons. First, Plaintiff has not plausibly alleged that Hunt "intentionally induced" the termination of the Construction Contracts. The Complaint contains no factual, non-conclusory allegations that could plausibly suggest Hunt desired to cause the terminations. And, while Plaintiff alleges that Hunt knew that notifying the General Contractors of Plaintiff's nonpayment would put Plaintiff in default under the Construction Contracts, it is not plausible to conclude that Hunt therefore knew that *termination* of those contracts was substantially certain to follow. (*See* DE 1 ¶ 151 (indicating that Hunt's actions did not result in the termination of all of Plaintiff's Construction Contracts).) Thus, Plaintiff's allegations fall short of plausibly showing that Hunt intentionally induced the termination of the Construction Contracts.

Second, the Complaint reveals that Hunt's actions were justified. While the Complaint makes many formulaic allegations that Hunt's contacts with the General Contractors were malicious and without justification, Plaintiff's *factual* allegations reveal that Hunt was acting, at least in part, for a legitimate business purpose: the collection of its debt. Hunt had a legal right to enforce its debts. *See, generally*, N.C. Gen. Stat. 44A-7, *et seq.* In fact, Plaintiff alleges that Hunt's efforts resulted in the recovery of at least $275,000. (DE 1-1, at Ex. 3.) "Because the face of the complaint admits of [a] 'motive for interference other than malice[,]'" this claim should be dismissed.[6]

### V.      Plaintiff's Claim for Punitive Damages Fails

Apparently in furtherance of its tortious interference claim, Plaintiff seeks an award of punitive damages. (DE 1 ¶¶ 153–56.)[7] In support of this remedy, Plaintiff alleges that Hunt's actions were "willful, wanton, and deliberate," that Hunt demonstrated a "complete and utter indifference to the rights and existence of [Plaintiff]," that Hunt was acting in furtherance of its own pecuniary interests "with no deference or care given to the rights of [Plaintiff]," and that a punitive damages award is necessary to prevent Hunt from collecting debts from its other customers in an unlawful way. (*Id.*) These allegations miss the mark.

North Carolina has established a "heightened pleading standard" for punitive damages demands. *HSG, LLC v. Edge-Works Mfg. Co.*, 15-CVS-309, 2015 WL 5824453, at *12 (N.C. Super.

---

[6]      To the extent Plaintiff's UDTPA claim is premised on Hunt's alleged interference with the Construction Contracts, that claim should be dismissed as well. (DE 1 ¶ 160.)

[7]      The punitive damages claim should be dismissed along with the tortious interference claim. A punitive damages demand cannot survive without an underlying claim. *E.g.*, *Horne v. Cumberland Cnty. Hosp. Sys., Inc.*, 228 N.C. App. 142, 150, 746 S.E.2d 13, 20 (2013) ("As a rule, you cannot have a cause of action for punitive damages by itself." (cleaned up)).

Oct. 5, 2015). "A demand for punitive damages shall be specifically stated . . . and the aggravating factor that supports the award of punitive damages shall be averred with particularity." N.C. R. Civ. P. 9(k). "Willful or wanton conduct means more than gross negligence." N.C. Gen. Stat. § 1D-5(7). A punitive damages demand can survive dismissal only if the complaint "allege[s] facts or elements showing the aggravating circumstances which would justify the award of punitive damages." *Wiley v. L3 Communications Vertex Aerospace, LLC*, 251 N.C. App. 354, 367, 795 S.E.2d 580, 590 (2016). Simply reciting statutory bases for punitive damages is insufficient. *Shugar v. Guill,* 51 N.C. App. 466, 469, 277 S.E.2d 126 (1981).

Here, Plaintiff states in a conclusory fashion that Hunt's actions were "willful, wanton, and deliberate" and indifferent to the Plaintiff's "rights" and "existence." (DE 1 ¶¶ 153–55.) Plaintiff does not state with any specificity what rights Hunt supposedly violated, why Hunt had any obligation to care about Plaintiff's continued operation when it was collecting its debts, or what specific conduct by Hunt exceeds gross negligence. In short, Plaintiff has not met its pleading burden, and its punitive damages demand should be dismissed.

### VI.     Plaintiff's Unfair and Deceptive Trade Practices Act Claim Fails

Plaintiff alleges that Hunt violated North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA") by engaging in three categories of conduct: (1) deceptive misrepresentations, (2) unfair debt collection activity, and (3) the imposition of unfair business terms. (*See, e.g.*, DE 1 ¶ 160.) Plaintiff's factual allegations, however, are insufficient to plausibly show a violation of the UDTPA, and therefore its claim should be dismissed.

"In order to establish a *prima facie* claim for unfair trade practices, a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff. A practice is unfair

if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive." *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001) (citations omitted).

### A.  Plaintiff has failed to properly plead any misrepresentation-based UDTPA claims

With regard to misrepresentations, Plaintiff's complaint appears to contain two distinct kinds of allegations. First, Plaintiff specifically alleges that Hunt (i) concealed the fact that Plaintiff had exceeded its credit limit and then (ii) misstated the amount due (the "Specific Allegations"). (DE 1 ¶¶ 32–35, 37–41, 160(a)–(b).) Second, and much more generally, Plaintiff alleges that, at some point, Hunt provided some "General Contractors" with some kind of "false and misleading information concerning MSS's ordering of materials, supplies, and products" or "relating to [Plaintiff's] indebtedness" (the "General Allegations"). (DE 1 ¶¶ 77, 160(a)); *see also* DE 1 ¶ 83 (alleging generally that Hunt supplied "false, untrue, and contradictory information" to T.D.K. Construction Co., Inc.—one of the general contractors). Neither species of allegation can survive scrutiny.

### i.  The General Allegations are not pleaded with particularity

Any UDTPA claim grounded on the General Allegations would fail at the outset. A UDTPA claim grounded in fraud or misrepresentation must be pleaded with particularity under Rule 9(b) of the Federal Rules of Civil Procedure. *Asby v. Medtronic, Inc.*, 673 F. Supp. 3d 787, 798 (E.D.N.C. 2023); *Topshelf Mgmt., Inc. v. Campbell-Ewald Co.*, 117 F. Supp. 3d 722, 726, 731–32 (M.D.N.C. 2015). To satisfy heightened pleading requirements of Rule 9, a plaintiff must allege "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).

18

In its General Allegations, Plaintiff does not identify when the supposed misrepresentations were made, where they were made, the individual who made them, or the individual to whom the representations were made. Plaintiff also fails to provide any meaningful insight into the content of the alleged misrepresentations, other than that they were somehow related to Plaintiff's indebtedness or its ordering of materials and were, allegedly, untrue. Because this paucity of factual detail does not satisfy the applicable pleading standard, any UDTPA claim arising from the General Allegations should be dismissed.

       **i.**       **The Specific Allegations do not plausibly show that Plaintiff relied on the alleged misrepresentations**

The Specific Allegations also cannot support a UDTPA claim. Plaintiff alleges that Hunt concealed the fact that Plaintiff had exceeded its credit limit. (DE 1 ¶¶ 32–35.) Plaintiff also alleges that Hunt incorrectly told Plaintiff on February 10, 2023, that Plaintiff owed $280,000 on these "Non-Invoiced Transactions" when, in fact, it owed over $694,000. (DE 1 ¶¶ 36–38.) Plaintiff claims that it did not learn the true balance until February 16, 2023. (DE 1 ¶ 39.)

One of the critical elements of a UDTPA claim is that the alleged act or practice must have "proximately caused injury to the plaintiff." *Dalton*, 353 N.C. at 656. In order to satisfy this causation element when a claim arises from alleged misrepresentations, the plaintiff must "demonstrate reliance on the misrepresentation." *Bumpers v. Cmty. Bank of N. Virginia*, 367 N.C. 81, 88, 747 S.E.2d 220, 226 (2013). Specifically, the plaintiff's allegations must show both that (i) it actually relied on the representation and (ii) its reliance was reasonable. *Id.* at 89–90. Actual reliance requires a showing that "plaintiff . . . affirmatively incorporated the alleged misrepresentation into [its] decision-making process: if it were not for the misrepresentation, the plaintiff would likely have avoided the injury altogether." *Id.* at 90. Even then, "[r]eliance is not

reasonable where the plaintiff could have discovered the truth of the matter through reasonable diligence, but failed to investigate." *Id.*

In this case, Plaintiff does not even attempt to allege that it actually relied. Even under Plaintiff's version of the narrative, none of the harms alleged in the Complaint—most notably, the termination of its Construction Contracts—flow from the misrepresentations detailed in the Specific Allegations. Nor does Plaintiff allege that it would have done anything differently had it immediately known the full amount that was due or that it had exceeded its credit limit. Quite to the contrary, Plaintiff's allegations strongly suggest that it would have ordered the materials regardless. (*See, e.g.*, DE 1 ¶¶ 26 (noting that the materials were "required to perform the underlying scopes of work set forth in the Construction Contracts"), 49 ("[Hunt's] continued sale and fulfillment of purchase orders for the Construction Projects was essential and required for the continued viability of MSS's business operations and its completion of the Construction Projects[.]").)

Even if Plaintiff had alleged that it had relied, any reliance would not have been reasonable. Plaintiff concedes that the transactions that pushed it over its credit limit by $694,000 were all initiated by "purchase orders and requests from [Plaintiff]" and its "prior material purchases." (DE 1 ¶¶ 32, 34, 38.) Not once does Plaintiff allege that any of the Non-Invoiced Transactions were illegitimate. (*Cf.* DE 1-1, at Ex. 1 (detailing Plaintiff's purchase order number for each of the Non-Invoiced Transactions.).) It stands to reason, therefore, that Plaintiff could have determined the scope of its indebtedness by reviewing its own records with reasonable diligence. It simply failed to investigate its own books and records.

In short, the Complaint does not plausibly show that Plaintiff relied on the misrepresentations identified in the Specific Allegations. In fact, it shows that reliance would have

been unreasonable. Consequently, to the extent Plaintiff's UDTPA claim flows from these alleged misrepresentations, it should be dismissed.

### B. Plaintiff has failed to properly plead any UDTPA claims based on Hunt's collection efforts

Plaintiff's second category of supposedly unfair practices relates to Hunt's efforts to collect its debt. Plaintiff alleges that, on a March 7 phone call, Hunt demanded repayment of $400,000 within 72 hours "or else." (DE 1 ¶ 49, 51–52.) Plaintiff understood "or else" to mean that, if payment was not made, Hunt would assert mechanic's liens against the General Contractors of the various Construction Projects. (DE 1 ¶ 53.) When Plaintiff made partial payments, Hunt applied them to the earliest orders. (DE 1 ¶ 61.) Plaintiff also alleges that Hunt "on a daily and weekly basis" demanded payment of the remaining amounts through phone calls, in-person visits, and other communications. (DE 1 ¶ 58–59, 76(a).) During one of these meetings, in April 2023, Hunt allegedly stated to Plaintiff, "I don't give a sh*t [about the parties' prior business history], you are going to pay me all the money you owe me." (DE 1 ¶¶ 67–68.) During that meeting, Hunt also allegedly criticized Plaintiff's business operations, revealing that Hunt knew that another of Plaintiff's suppliers was also owed a substantial sum of money. (DE 1 ¶¶ 64–66.) Hunt refused to agree to a deferred payment schedule. (DE 1 ¶¶ 63, 65, 69.) Ultimately, when Plaintiff did not pay the full amount, Hunt filed claims of lien against the General Contractors and demanded payment directly from them. (DE 1 ¶¶ 73, 76(b), 76(e).)[8]

---

[8]   Plaintiff also states that Hunt "threaten[ed] . . . [to] undertake actions that it was not legally entitled to deploy or undertake." (DE 1 ¶ 160.) There are no factual allegations to support this assertion, which appears to be plucked from the misconduct listed in the North Carolina Debt Collection Act. *See* N.C. Gen. Stat. § 75-51(8). The allegation should therefore be rejected. *Iqbal*, 556 U.S. at 663 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The same holds true for Plaintiff's copy-and-paste, non-factual allegations in Paragraphs 160(f) and 160(g).

The Court must decide, as a matter of law, whether this alleged conduct rises to the level of a violation of the UDTPA. *Dalton,* 353 N.C. at 656 ("The determination as to whether an act is unfair or deceptive is a question of law for the court."). The question is whether the behavior is "unethical or unscrupulous." *Id.* The Court is not left without guidance, however. In considering this question, the Court may look to the North Carolina Debt Collection Act (the "NCDCA") for a list of "specific examples of unfair or deceptive acts . . . in the context of debt collection." *DIRECTV, Inc. v. Cephas*, 294 F. Supp. 2d 760, 765 (M.D.N.C. 2003) ("Although DIRECTV cannot be directly liable under the NCDCA, provisions of that statute provide examples of behavior that will be considered unfair and deceptive within the broader scope of the UDTPA's restrictions.") Indeed, the UDTPA's standard for debt collection activities between sophisticated business entities should be less stringent than the NCDCA's standard protecting consumers.

Plaintiff's allegations are not remotely analogous to the conduct censured by the NCDCA. (*Compare* DE 1*, with* N.C. Gen. Stat. § 75-51 to -55.) For example, Plaintiff does not allege any facts suggesting that Hunt threatened to use violence, threatened to have Plaintiff's agents arrested, caused Plaintiff's telephone to ring with unreasonable frequency or outside of waking hours, publicly disclosed Plaintiff's debt, or brought a lawsuit in a faraway forum. At worst, Plaintiff's allegations indicate that, callous to the hardship payment might impose on Plaintiff, Hunt firmly demanded—perhaps on a daily basis—the payments to which it was legally entitled, refused to compromise, and ultimately exercised its legal rights to collect. Apparently, as Plaintiff sees it, Hunt's only permissible course of action under the UDTPA would have been to defer collection and enforcement of its debts if they would threaten Plaintiff's well-being. That cannot be the law. To suggest that the ordinary, often-necessary, and statutorily-permitted collections activity alleged here is somehow prohibited would trivialize the gravity of the UDTPA and menace much of the

22

WBD (US) 4926-7596-5506

economic activity in this state. Simply put, the alleged debt collection activities are not unfair acts, and therefore they cannot support Plaintiff's UDTPA claim.

### C. Plaintiff has failed to properly plead any UDTPA claims based on Hunt's protective modifications to its business terms

After Plaintiff fell nearly $1.5 million behind on its payments to Hunt, Plaintiff alleges that Hunt (1) threatened to cancel outstanding, unpaid orders, (2) required Plaintiff to start paying up front instead of offering credit for new purchases, and (3) refused to deliver materials for which Plaintiff had not paid. (DE 1 ¶¶ 42, 55–56, 76(c)–(d), 79.) It is impossible to discern how this conduct can be considered anything other than prudent business. Because no reasonable person could consider these actions "unethical or unscrupulous," the Court should conclude as a matter of law that they are not "unfair" or "deceptive" within the meaning of the UDTPA. Furthermore, there are no factual allegations suggesting that these behaviors proximately caused any injury to Plaintiff. The collapse of Plaintiff's business was caused by its own inability to procure and pay for its supplies, not by Hunt's unwillingness to continue providing the supplies for free.

In sum, Plaintiff's allegations that Hunt changed the way it was willing to do business with Plaintiff moving forward do not plausibly allege any violations of the UDTPA. Accordingly, the claim should be dismissed.

### CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

23

WBD (US) 4926-7596-5506

Dated:  May 14, 2025

**WOMBLE BOND DICKINSON (US) LLP**

By:  /s/ James S. Livermon, III
James S. Livermon, III
NC State Bar No. 26492
Jesse A. Schaefer
NC State Bar No. 44773
Eudora F. S. Arthur
NC State Bar No. 59854
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
Telephone: (919) 755-2148
Email:   charlie.livermon@wbd-us.com
         jesse.schaefer@wbd-us.com
         dorie.arthur@wbd-us.com

*Counsel for Hunt Electric Supply Company*

WBD (US) 4926-7596-5506

## **CERTIFICATE OF SERVICE**

I, the undersigned, certify:

That I am, and at all times hereinafter mentioned was, more than eighteen (18) years of age;

That on this day, the foregoing Motion to Extend Time to Answer Complaint was served by electronic means through the court's CM/ECF service on:

> Joseph Z. Frost, Esq.
> Buckmiller, Boyette & Frost, PLLC
> *Attorney for Debtor-Plaintiff MSS, Inc.*

I certify under penalty of perjury that the foregoing is true and correct.

Dated:  May 14, 2025          **WOMBLE BOND DICKINSON (US) LLP**

> /s/ James S. Livermon, III
> James S. Livermon, III
> NC State Bar No. 26492
> Jesse A. Schaefer
> NC State Bar No. 44773
> Eudora F. S. Arthur
> NC State Bar No. 59854
> 555 Fayetteville Street, Suite 1100
> Raleigh, NC 27601
> Telephone: (919) 755-2148
> Email:   charlie.livermon@wbd-us.com
>             jesse.schaefer@wbd-us.com
>             dorie.arthur@wbd-us.com

> *Counsel for Hunt Electric Supply Company*

25

**Exhibit A**

## Abbie Thomas

| | |
|---|---|
| **From:** | no-reply@efilingmail.tylertech.cloud |
| **Sent:** | Tuesday, July 11, 2023 7:08 AM |
| **To:** | Abbie Thomas |
| **Subject:** | Filing Accepted for Case: 23M003284-910;  HUNT ELECTRIC SUPPLY COMPANY VS MERIDIAN AT ROGERS BRANCH, LLC; Envelope Number:  142899 |

# Filing Accepted
Envelope Number: **142899**

The filing below was reviewed and has been accepted by the Clerk's office located in Wake District Court, NC. Please click the link below to retrieve a filed-stamped copy of your eFiled document

| Filing Details | |
|---|---|
| Court | District Court |
| Case Number | 23M003284-910 |
| Case Style | HUNT ELECTRIC SUPPLY COMPANY VS MERIDIAN AT ROGERS BRANCH, LLC |
| Date/Time Submitted | 7/10/2023 1:42 PM EST |
| Date/Time Accepted | 7/11/2023 7:07 AM EST |
| Accepted Comments | **Please submit the filling fee of $7.25 to the Wake County Clerk of Court** |
| Filing Type | Claim Of Lien |
| Activity Requested | EFile |
| Filed By | Abbie Thomas |

| Document Details | |
|---|---|
| Lead File | 7 7 23 Hunt Electric Rogers Branch Claim of Lien.pdf |
| Lead File Page Count | 6 |
| File Stamped Copy | https://northcarolina.tylertech.cloud/ViewDocuments.aspx?FID=561b8ab8-98f0-4e9f-9e1e-22c3883a16cf<br>This link is active for 60 days. |

| For Technical Assistance |
|---|

Contact Tyler Technologies

Please do not reply to this email. It was generated automatically by no-reply@efilingmail.tylertech.cloud.

1

23M003284-910

NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
DISTRICT COURT DIVISION
23 M _____

## CLAIM OF LIEN ON REAL PROPERTY

PLEASE TAKE NOTICE that the undersigned lienor being a second-tier subcontractor as defined by G. S. §44A-23, claims a lien on the real property described herein.

1.   NAME AND ADDRESS OF PERSON CLAIMING THE CLAIM OF LIEN ON REAL PROPERTY:

HUNT ELECTRIC SUPPLY COMPANY
c/o R. Samuel Hunt, III, Registered Agent
1213 Maple Avenue
Burlington, NC 27215

2.   NAME AND ADDRESS OF RECORD OWNER OF THE REAL PROPERTY CLAIMED TO BE SUBJECT TO THE CLAIM OF LIEN ON REAL PROPERTY AT THE TIME THE CLAIM OF LIEN ON REAL PROPERTY IS FILED AND, IF THE CLAIM OF LIEN ON REAL PROPERTY IS BEING ASSERTED PURSUANT TO G.S. §44A-23, THE NAME OF THE CONTRACTOR THROUGH WHICH SUBROGATION IS BEING ASSERTED:

**Owner**:
Meridian at Rogers Branch, LLC
c/o NorthView Partners, LLC, Registered Agent
6131 Falls of Neuse Road, Suite 202
Raleigh, NC 27609
*As Listed on Lien Website*

**Lien Agent:**
Chicago Title Company, LLC
223 S. West Street, Suite 900
Raleigh, NC 27603

**General Contractor:**
NorthView Construction, LLC
c/o Mark R. Barker, Registered Agent
6131 Falls of Neuse Road, Suite 202
Raleigh, NC 27609

01603C-000096/456683 v1

Electronically Filed Date: 7/10/2023 1:42 PM  Wake County Clerk of Superior Court

**First Tier Subcontractor:**
MSS-Ortiz Electrical Services
2315 Sparger Road
Durham, NC 27705

3.  DESCRIPTION OF THE REAL PROPERTY UPON WHICH THE CLAIM OF LIEN ON REAL PROPERTY IS CLAIMED: The real property and improvements thereon recorded in Deed Book 18211, Page 1106 of the Wake County Registry, to which reference is hereby made for a more particular description of same. The physical address of this property 1120 Meridian Branch Drive, Wake Forest, NC 27587.

4.  NAME AND ADDRESS OF PERSON WITH WHOM THE CLAIMANT CONTRACTED FOR THE FURNISHING OF LABOR OR MATERIALS:

     MSS-Ortiz Electrical Services
     2315 Sparger Road
     Durham, NC 27705

5.  DATE UPON WHICH LABOR OR MATERIALS WERE FIRST FURNISHED UPON SAID PROPERTY BY THE CLAIMANT:            June 2, 2021

6.  DATE UPON WHICH LABOR OR MATERIALS WERE LAST FURNISHED UPON SAID PROPERTY BY THE CLAIMANT:            April 4, 2023

7.  GENERAL DESCRIPTION OF THE LABOR PERFORMED, MATERIALS FURNISHED AND THE AMOUNT CLAIMED THEREFORE: Hunt Electric Supply Company was contracted by MSS-Ortiz Electrical to make improvements to the real property located at 1120 Meridian Branch Drive, Wake Forest, NC 27587 as recorded in Deed Book 18211, Page 1106 of the Office of the Register of Deeds of Wake County, NC. Hunt Electric supplied electrical supplies and material for purposes of construction and repairs to the property listed in this paragraph. The amount due to Claimant on the project is Three Hundred Fifteen Thousand and Six Hundred Eighty-Three Dollars and Forty-Four Cents ($315,683.44) plus interest, court costs and attorney's fees to the extent allowed by law.

## CERTIFICATION

I hereby certify that I have served the parties listed in Paragraph 2 above in accordance with the requirements of G.S. 44A-11.

01603C-000096/456683 v1

Submitted for and on behalf of the above-named lien claimant this the ___7ᵗʰ___ day of July, 2023.

HUNT ELECTRIC SUPPLY COMPANY
*Lien Claimant*

By: _____
BENJAMIN D. OVERBY
*Attorney for Lien Claimant*

OF COUNSEL:

THE VERNON LAW FIRM, P.A.
P.O. Drawer 2958
Burlington, North Carolina 27216-2958
Telephone: (336) 227-8851
Facsimile: (336) 226-3866
Email: bdo@vernonlaw.com

01603C-000096/156683 v1

NORTH CAROLINA

WAKE COUNTY

## NOTICE OF CLAIM OF LIEN UPON FUNDS
## BY SECOND TIER SUBCONTRACTOR

**PLEASE TAKE NOTICE that HUNT ELECTRIC SUPPLY COMPANY, 1213 Maple Avenue, Burlington, NC 27215, claims a lien on funds owed to the contractor against or through whom this claim is made. Upon receipt of this lien on funds you may not make any further payments to any of these parties unless you retain from such payments an amount sufficient to satisfy this lien on funds claimed herein. Failure to retain such funds may result in direct liability to the lien claimant.**

1.    <u>Owner of Property Involved</u>:

> Meridian at Rogers Branch, LLC
> 6131 Falls of Neuse Road, Suite 202
> Raleigh, NC 27609
> *As Listed on Lien Website*

2.    <u>Lien Agent</u>:

> Chicago Title Company, LLC
> 223 S. West Street Suite 900
> Raleigh, NC 27603

3.    <u>General Contractor</u>:

> NorthView Construction, LLC
> c/o Mark R. Barker, Registered Agent
> 6131 Falls of Neuse Road, Suite 202
> Raleigh, NC 27609

4.    <u>Name and address of first-tier subcontractor against or through whom subrogation is claimed, if any</u>:

> MSS-Ortiz Electrical Services
> 2315 Sparger Road
> Durham, NC 27705

01603C-000096/456683 v1

5. **General description of real property where labor performed or material furnished:** The real property and improvements thereon recorded in Deed Book 18211, Page 1106 of the Wake County Registry, to which reference is hereby made for a more particular description of same. The physical address of this property 1120 Meridian Branch Drive, Wake Forest, NC 27587.

6. **General description of undersigned lien claimant's contract including the names of the parties thereto:** Hunt Electric supplied electrical supplies and material for purposes of construction and repairs to the property listed in this paragraph to MSS-Ortiz Electrical Services. The real property and improvements thereon recorded in Deed Book 18211, Page 1106 of the Wake County Registry, to which reference is hereby made for a more particular description of same. The physical address of this property 1120 Meridian Branch Drive, Wake Forest, NC 27587.

7. **The amount of lien upon funds claimed pursuant to the above-described contract:**

$315,683.44

The undersigned lien claimant gives this **Notice of Claim of Lien upon funds** pursuant to North Carolina law and claims ALL RIGHTS OF SUBROGATION to which he is entitled under Part 2 of Article 2 of Chapter 44A of the General Statutes of North Carolina.

Dated: July _____, 2023

HUNT ELECTRIC SUPPLY COMPANY
*Lien Claimant*

By: _____
    ,BENJAMIN D. OVERBY
    *Attorney for Lien Claimant*

OF COUNSEL:

THE VERNON LAW FIRM, P.A.
P.O. Drawer 2958
Burlington, North Carolina 27216-2958
Telephone: (336) 227-8851
Facsimile: (336) 226-3866
Email: bdo@vernonlaw.com

01603C-000096/456683 v1

## CERTIFICATE OF SERVICE

I hereby certify that I have this day duly served a copy of the Notice of Claim of Lien on Funds on the following by depositing a copy hereof in a postpaid wrapper in a post office or official depository under the exclusive care and custody of the United States Post Office Department, **by certified mail, return-receipt requested,** properly addressed to the following:

Meridian at Rogers Branch, LLC
c/o NorthView Partners, LLC, Registered Agent
6131 Falls of Neuse Road, Suite 202
Raleigh, NC 27609

Chicago Title Company, LLC
223 S. West Street, Suite 900
Raleigh, NC 27603

MSS-Ortiz Electrical Services
2315 Sparger Road
Durham, NC 27705

NorthView Construction, LLC
c/o Mark R. Barker, Registered Agent
6131 Falls of Neuse Road, Suite 202
Raleigh, NC 27609

This the _____ day of July, 2023.

_____
BENJAMIN D. OVERBY
*Attorney for Lien Claimant*

01603C-000096/456683 v1

| | |
|---|---|
| STATE OF NORTH CAROLINA | CERTIFICATE OF SATISFACTION, RELEASE AND CANCELLATION OF LIEN |
| COUNTY OF WAKE | 23M003284-910 |

On or about July 10, 2023, Hunt Electric Supply Company ("Hunt Electric") filed and served a Claim of Lien on Real Property and a Notice of Claim of Lien on Funds by second-tier subcontractor (the "Lien") in the principal amount of $315,683.44 against property described as that certain real property and improvements thereon situated at the physical address of 1120 Meridian Branch Drive, Wake Forest, NC 27587, and being further described in Deed Book 18211, Page 1106 of the Wake County Registry (the "Property"). The Lien names Meridian at Rogers Branch, LLC as the owner of the Property and NorthView Construction, LLC as the General Contractor. The Lien was recorded in the office of the Wake County Clerk of Superior Court as file number 23M003284-910.

Hunt Electric acknowledges that it has settled, and hereby waives and releases all claims for payment against Meridian at Rogers Branch, LLC, NorthView Construction, LLC and the Property for the labor, materials and supplies set forth in the Lien. The Lien, and the claims set forth therein have been settled, released and satisfied, and Hunt Electric hereby authorizes and directs the Wake County Clerk of Superior Court to satisfy and cancel the Lien on the Clerk's records, as provided in N.C. Gen. Stat. §44A-16(2).

This the 21 day of July, 2023.

Sworn to and subscribed before me, this the 2 1 day of July, 2023.

_Detsy B. Gentry_
Notary Public

NOTARY My Commission Expires: 6-7-2025

PUBLIC

GUILFORD COUNTY NC

Lien Claimant:
Hunt Electric Supply Company

By: _____

Name: Sam Hunt IV

Title: President

NPDocuments:61459044.1

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing **CERTIFICATE OF SATISFACTION, RELEASE AND CANCELLATION OF LIEN** was duly served in accordance with the provisions of Rule 5 of the North Carolina Rules of Civil Procedure by depositing it in the United States Mail, first-class postage prepaid, addressed as follows:

The Vernon Law Firm, P.A.
c/o Benjamin D. Overby
P.O. Drawer 2958
Burlington, NC 27216-2958

Hunt Electric Supply Company
c/o R. Samuel Hunt, III, Registered Agent
1213 Maple Ave.
Burlington, NC 27215

This the 24th day of July, 2023.

Jonathan W. Massell
Nexsen Pruet PLLC
c/o Jonathan W. Massell
4141 Parklake Ave., Ste. 200
Raleigh, North Carolina 27612
*Attorney for Meridian at Rogers Branch, LLC and NorthView Construction, LLC*

NPDocuments:61459044.1