**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

IN RE:

MSS, INC.,

**CASE NO. 23-02487-5-JNC**
**CHAPTER 11**

DEBTOR.

---

| | |
|---|---|
| MSS, INC., *Plaintiff*, vs. HUNT ELECTRIC SUPPLY COMPANY, *Defendant*. | **ADV. PRO. NO. 25-00045-5-JNC** |

**MEMORANDUM OF LAW IN OPPOSITON**
**TO MOTION TO DISMISS**

---

Plaintiff MSS, INC., ("MSS" or "Plaintiff"), by and through undersigned counsel of record, and in opposition to the Motion to Dismiss [D.E. 10] and accompanying Memorandum of Law in Support of Motion to Dismiss [D.E. 11] (collectively, the "Motion to Dismiss") filed by Defendant HUNT ELECTRIC SUPPLY COMPANY ("Hunt Electric" or "Defendant"), sets forth the legal grounds and bases upon which the Court should deny, in its entirety, the relief requested in the Motion to Dismiss under Fed. R. Civ. P. 12(b)(6), as MSS has plausibly stated claims against Hunt Electric for avoidance and recovery of preferential transfers totaling $2,749,405.15 under §§ 547(b) and 550 of the Bankruptcy Code, tortious interference with contractual relations, and violations of the

North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq.* (the "UDTPA").

### INTRODUCTION AND SUMMARY OF ARGUMENT

The Motion to Dismiss should—and must—be **DENIED** based upon the following:

1. MSS has pled with the requisite plausibility that Hunt Electric was a non-statutory insider for purposes of § 547(b)(4)(B) and the transfers and payments totaling $2,749,405.15, made to Hunt Electric within the one-year period preceding the filing of the above-captioned bankruptcy proceeding, are avoidable and recoverable as preferential transfers under § 547(b) of the Bankruptcy Code.

2. MSS has plausibly alleged, in the Complaint, that Hunt Electric intentionally interfered with the contracts between MSS and third party general contractors, without justification. MSS, for the reasons set forth herein, and given that it's a remedy to which it is entitled by virtue of its claim for tortious interference with contractual relations, the allegations relating to the malicious, unfair, and deceptive conduct deployed by Hunt Electric are sufficient to entitle MSS to an award of punitive damages under N.C. Gen. Stat. § 1D.

3. MSS, likewise, and for the reasons set forth herein, has plausibly demonstrated entitlement to relief against Hunt Electric for violations of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq.* (the "UDTPA"). Aside from the fact its claim for intentional inference with contractual relations may form the basis of a claim for violation of the UDTPA, MSS has plausibly demonstrated that Hunt Electric engaged in various acts, conduct, and practices that were in and affecting

commerce, unfair, deceptive, misleading, unscrupulous, and coercive, and resulted in substantial injury to MSS.

MSS, in the alternative, and under Fed. R. Civ. P. 15, requests leave to amend the Complaint to supplement the pre-existing allegations set forth in the Complaint and further demonstrate its entitlement to relief against Hunt Electric.

## FACTUAL BACKGROUND

MSS filed a voluntary petition seeking relief under chapter 11 of the Bankruptcy Code on August 28, 2023 (the "Petition Date"), BK Case No. 23-02487-5-JNC (the "Bankruptcy Case"). MSS, at all times relevant hereunder, was a North Carolina corporation that provided electronic subcontracting services to various large multi-family construction projects throughout North Carolina and South Carolina, including the following:

| Construction Project | Owner | General Contractor |
|---|---|---|
| Park View | Park View (Greer), LLC | Clayton Construction Company, Inc. |
| Symphony Park | BFG Huntersville PropCo, LLC | Carolina Commercial Contractors, LLC |
| Medley at Northwood Landing | Medley at Northwood Landing, LLC | Carolina Commercial Contractors, LLC |
| Vintage Raleigh West | Vintage Raleigh West Owner, LLC | T.D.K. Construction Co., Inc. |
| Meridian at Rogers Branch | Meridian at Rogers Branch, LLC | NorthView Construction, LLC |
| Birch Hill | Birch Hill Apartments, LLC | Encore Construction, Inc. |

(collectively, the "Construction Projects"). Compl. [D.E. 1], at ¶¶ 24-25. For the Construction Projects, MSS executed written agreements with the General Contractor, setting forth the duties, responsibilities, scope of work that was to be performed by MSS,

3

including the following:

A. Clayton Construction Company, Inc. Subcontract between Clayton Construction Company, Inc. ("Clayton") and MSS dated July 28, 2021, relating to the Park View Project. (the "Clayton Construction Contract");

B. Standard Form of Agreement Between Contractor and Subcontractor dated August 9, 2021, between NorthView Construction, LLC ("NVC") and MSS dated August 9, 2021, relating to the Meridian at Rogers Branch Project (the "NVC Construction Contract");

C. Contract between T.D.K. Construction Co., Inc. ("TDK") and MSS dated October 4, 2021, for the Vintage Raleigh West Project (the "TDK Construction Contract");

D. Subcontract Agreement between Carolina Commercial Contractors, LLC ("CCC") and MSS dated April 4, 2022, relating to the Symphony Park Project (the "2021 CCC Construction Project"); and

E. Subcontract Agreement between CCC and MSS dated June 26, 2023, relating to the Medley at Northwood Landing Project (the "2023 CCC Construction Contract").

(collectively, the "Construction Contracts"). Id. at ¶ 24. As required to perform the underlying scopes of work in the Construction Contracts and for each of the Construction Projects, MSS purchased all of the necessary and required electrical supplies, materials, and products from Hunt Electric. Id. at 26. Hunt Electric did not obtain, nor was it granted, a security interest, lien, or encumbrance in any of the electrical materials, supplies, goods, or products that were purchased by, and sold to, MSS, in connection with the Construction Projects. Id. at ¶ 28. As a result, is and at all times relevant hereunder was, an unsecured creditor of MSS with respect to any debt, obligation, and liability arising from the purchase and sale of electrical materials and supplies by MSS. Id. at ¶ 29.

MSS was, at all relevant times hereunder, the largest customers of, and purchasers

4

of electrical supplies and materials from, Hunt Electric. Compl. [D.E. 1], at ¶¶ 19 & 31. Traditionally, MSS was permitted and allowed to purchase electrical supplies, materials, products, and goods from Hunt Electric, on account, so long as the outstanding balance owed by MSS thereunder did not exceed the sum of $1,000,000.00 (the "Hunt Credit Limit" or the "Credit Limit"). Id. at ¶ 13. Between January 1, 2019, and April 25, 2023, and based upon the relationship with MSS, Hunt Electric received payments from MSS totaling $20,537,206.20 for those electrical supplies, goods, products, and materials purchased by MSS for all of its construction projects throughout North Carolina and South Carolina. Id. at ¶¶ 18 & 67.

Unbeknownst to MSS, and in order to maximize the commission Moses Jacobs ("Jacobs")[1] would receive based upon the volume of sales for the Durham Branch, Hunt Electric began fulfilling purchase orders and requests for electrical supplies and materials from MSS, but not enter said purchase orders into the master inventory, accounting, and billing system utilized by Hunt Electric across its various branches to track and monitor inventory as well as invoicing to its customers. Id. at ¶ 32. MSS, as a result, would not receive any invoice or notice from Hunt Electric relating to any purchase orders and requests that Jacobs failed to enter into the system. Id. at ¶ 33. Moreover, and because the purchase orders and requests that were not entered into the system, they did not reduce nor were they applied towards the existing Credit Limit that MSS had with Hunt Electric. Id.

---

[1] Jacobs, at all times relevant hereunder, was the Branch Manager for the branch location in Durham, North Carolina (the "Durham Branch"), served as the primary point of contact with Hunt Electric for MSS until February 2023. Compl [D.E. 1], at ¶ 15-17.

at ¶ 34.

By processing, accepting, and fulfilling purchase orders from MSS, and simultaneously holding and delaying entry of the same into Hunt Electric's system for a period of at least nine (9) months: (a) MSS would not receive an invoice or any other record from MSS showing any amounts due and owing for the underlying electrical materials, supplies, materials, or other goods purchased;  (b) The amounts attributed to these purchase orders would not be reflected in, or count against, the Credit Limit that MSS had with Hunt Electric; (c) MSS would be able to purchase electrical materials, supplies, goods, and products in amounts exceeding the Credit Limit that had been established by Hunt Electric; (d) Hunt Electric, specifically the Durham Branch, would be able to continue to sell electrical products, materials, goods, and supplies to MSS without having to worry about whether any of the transactions would decrease the Credit Limit established for MSS; and (e) Jacobs and other employees at the Durham Branch would maximize the compensation to which he was entitled, being that it was tied to sales generated by the Durham Branch, and one of its largest customers, MSS, had additional buying power due to non-entry of purchase orders into the software system. Compl. [D.E. 1], at  ¶ 34.

MSS, until February 10, 2023, was not aware of the holding and delayed entry by Hunt Electric and its employees of purchase transactions with MSS into software system. Compl. [D.E. 1], at ¶¶ 35-36.  On February 10, 2023, Matthew Filzen, the Chief Operating Officer of MSS ("Matthew Filzen"), received a text communication from Jacobs, stating that the sum of $249,003.09 was more than thirty (30) days past due and the sum of $311,925.83, was due and payable for the month of February 2023, for electrical materials,

6

goods, supplies, and products purchased for the Construction Projects. Id. at ¶ 36. Jacobs, in addition, informed Matthew Filzen that the foregoing amounts due for February 2023, were in addition to the $280,000 of invoices that he was "holding" and had not entered into Hunt Electric's inventory and invoicing system. Id. at 37. This was the first time that MSS was made aware that MSS had not been invoiced by Hunt Electric for prior material purchases totaling approximately $280,000.00, all of which had been previously delivered, fulfilled, and consumed by MSS in connection with the Construction Projects. Id. at ¶ 38.

Approximately a week later, on or about February 16, 2023, Jacobs met with Matthew Filzen at the main office of MSS in Durham (the "MSS Main Office") and handled him a manilla folder with the name "MATT" written on the top, containing nineteen (19) separate Quotations, which evidenced numerous sales of electrical supplies, products, and goods to MSS between May 23, 2022, and August 18, 2022, which had been fulfilled and delivered, but never invoiced to MSS (the "Non-Invoiced Transactions"). Compl. [D.E. 1], at ¶ 39 & Ex. 1. The total amount of the Non-Invoiced Transactions, which MSS had just learned about less than seven (7) days prior, was $694,426.05, approximately $414,426.05 more than MSS was previously advised by Jacobs on February 10, 2023. Id. at ¶¶ 39-41 & Exs. 1-2. These amounts, unbeknownst to MSS, had been bearing interest at a rate equal to 1.5% per month, for the past nine (9) months. Id. at ¶ 41 & Ex. 2.[2] Jacobs, likewise, informed MSS that the Non-Invoiced Transactions had still not

_____

[2] As a result of the Non-Invoiced Transactions, and when combined with the purchases of electrical supplies, materials, and goods that had been properly accounted for totaling $799,572.99, the outstanding balance due and owing to Defendant, as of February 16, 2023,

been entered into Hunt Electric's inventory and billing software system. Id. at ¶ 43.

At some point after February 16, 2023, and before March 5, 2023, the Non-Invoiced Transactions were entered into Hunt Electric's inventory and billing software system. Compl. [D.E. 1], at ¶ 45.  On March 5, 2023, Jacobs called Dallas A. Swain ("Swain"), the President of MSS, to schedule a phone conference on March 7, 2023, to discuss payment of the outstanding balance owed to Defendant and arising from the purchase of electrical materials, supplies, goods, and products by MSS, including but not limited to, the Non-Invoiced Transactions (the "March 7, 2023 Phone Conference"). Id. at  ¶¶ 46 & 48.[3]

During the course of the March 7, 2023 Phone Conference, in which Hunt Electric was represented by counsel who also attended and participated, Hunt III on behalf of Defendant repeatedly demanded payment from MSS and insinuated that the Hunt Electric's continued sale and fulfilment of purchase orders for the Construction Projects was essential and required for the continued viability of MSS's business operations and its completion of the Construction Projects under the Construction Contracts. Compl. [D.E. 1], at ¶ 49. Hunt Electric, through its officers, agents, and representatives, repeatedly exercised the control, influence, and superior bargaining power that it possessed over MSS, which was

---

was not less than $1,493,999.04, and far exceeded the Credit Limit.  Compl. [D.E. 1], at ¶ 42.

[3] The March 7, 2023 Phone Conference included the following participants: (A) R. Samuel Hunt, III, Chairman of the Board of Directors for Hunt Electric Supply Company ("Hunt III"); (B) Vicky Hunt, Secretary of Hunt Electric Supply Company; (C) Benjamin D. Overby, Jr. of Vernon Law Firm, as counsel for Hunt Electric Supply Company; (D) Matthew Filzen; (E) Melissa Filzen; (F) Dallas Swain; (G) Rodney Sharpe; and (H) Jacobs. Compl. [D.E. 1], at ¶ 47.

derived from its status/position as the sole and exclusive electrical material supplier for MSS and the non-public information it possessed with respect to the Construction Contracts during the course of the March 7, 2023 Phone Conference. Id.  Defendant's control, influence, and superior bargaining power over MSS's business operations, financial affairs, and decision making, including any decision regarding payment of, *inter alia*, the Non-Invoiced Transactions or any other amounts owed to Defendant was demonstrated in the March 7, 2023 Phone Conference when, Hunt III stated to MSS as follows: "You are going to pay me $400,000.00 by Friday or else" and approximately seventy-two (72) hours from the March 7, 2023 Phone Conference. Id. at ¶¶ 51-52.

MSS understood that, if it did not pay Hunt Electric the sum of $400,000.00, as demanded by Hunt III within seventy-two (72) hours, then Hunt Electric possessed the power, control, and ability to cause MSS to be financially and operationally insolvent and trigger MSS to default under the Construction Contracts and lose the anticipated income and revenue that MSS was generating from the performance of the Construction Contracts. Compl. [D.E. 1], at ¶¶ 53.  Moreover, and given the circumstances, including that Hunt Electric was the sole and exclusive electrical supplier for the Construction Projects, MSS

Left without any other option or alternative, based upon the threats expressed during the March 7, 2023 Phone Conference, and avoid Hunt Electric taking any adverse or disruptive action to the Construction Projects, MSS obtained a loan from a third-party, paid the sum of $458,445.16, to Defendant on March 10, 2023. Compl. [D.E. 1], at ¶¶ 54 & Ex. 3.  From and after March 7, 2023, Hunt Electric terminated the Credit Line and began requiring payment from MSS upon delivery of any electrical supplies, goods, materials,

9

and products ("COD")—as opposed to, the prior established practice of invoicing MSS for those electrical products, materials, and supplies that were purchased on a monthly basis. Id. at ¶¶ 55-56. The change of the payment terms for MSS's to COD, when combined with the demands for immediate payment of all outstanding amounts owed by MMS (including the Non-invoiced Transactions), were unreasonable and overreaching given MSS's exclusive use of Hunt Electric as its sole supplier for numerous years. Id. at ¶ 56.[4]

Following its remittance of this initial payment to Defendant, MSS was plagued on a daily and weekly basis by, *inter alia*, visits, phone calls, and communications from Jacobs and Rodney Sharpe ("Sharpe"), who were employees and representatives of Hunt Electric, demanding immediate payment of the entire outstanding balance owed to Defendant. Compl. [D.E. 1], at ¶¶ 58-59. As a result of the control and influence wielded over MSS, both professionally and financially, and the aforementioned repeated demands for payment, Hunt Electric procured the following payments from MSS following the March 7, 2023 Phone Conference:

| Date | Payment Amount |
|---|---|
| 3/10/2023 | $458,445.16 |
| 3/16/2023 | $126,312.42 |
| 3/24/2023 | $126,312.42 |
| 3/31/2023 | $124,456.18 |
| 4/24/2023 | $122,562.52 |

Id. at ¶¶ 59-60 & Ex. 3. Hunt Electric applied each of the foregoing payments to the Non-

---

[4] As a result of the unreasonable and overreaching demands for substantial payments and changes in the established payment and invoicing arrangement with Hunt Electric in March 2023, MSS for the first time, was forced to establish working relationships with other electrical and material suppliers for the Construction Projects.

Invoiced Transactions first, as opposed to those transactions and purchases that it had properly entered into its software system. Id. at ¶ 61.  Hunt Electric, as a result of the application of said payments, ensured that MSS did not receive any measurable benefit as a result of said payments, i.e., payments were not applied towards those goods, materials, and supplies that were necessary for the completion of the Construction Projects. Id.

Following the remittance of these payments, which pushed MSS past the brink of insolvency, an in-person meeting was held at the Hunt Electric's main offices located in Burlington, North Carolina (the "Hunt Electric Main Office") (the "April 2023 Meeting"),[5] the purpose of which was to establish repayment of all remaining amounts owed to Hunt Electric by MSS.  Compl. [D.E. 1], at ¶¶ 62-63.  Again and on full display during the April 2023 Meeting, was the exertion of the overwhelming and overreaching control and influence that Hunt Electric possessed over MSS.  Id.  The control and influence that was wielded by Hunt Electric was so significant that it could, unilaterally and through its actions, determine and dictate whether MSS had the ability to continue with performance of the Construction Contracts or cause MSS to default under the Construction Contracts. Id. at ¶ 63.[6]   and secured the outstanding balances owed by MSS to these other material suppliers.

---

[5] The April 2023 Meeting was attended by the following: (A) Hunt, III; (B) R. Samuel Hunt, IV, as President of Hunt Electric Supply Company; (C) Vicky Hunt; (D) Sharpe; (E) Matthew Filzen; (F) Melissa Filzen; and (G) Swain

[6] To maintain is continued leverage and control over MSS, and prior to the April 2023 Meeting, Hunt Electric made inquiries with and secured information relating to any outstanding indebtedness that was owed by MSS to any other third-party other material suppliers, including Capital Lighting & Supply, LLC a/k/a Capital Electric ("Capital Electric").  Compl. [D.E. 1], at ¶ 64.

During the April 2023 Meeting, and through its officers, Matthew Filzen, Melissa Filzen, and Swain, MSS begged and pleaded with Hunt Electric and its officers/principals to consider and permit some deferred payment of the outstanding balance owed to Hunt Electric that would allow MSS to continue with the Construction Projects and generate revenue that would be utilized to fund payments to Hunt Electric. Compl. [D.E. 1], at ¶ 65. In support thereof, MSS reminded Hunt Electric of the longstanding and profitable relationship that they had enjoyed over the past four-year period. Id. at ¶ 67.  In response, and a demeaning manner, Hunt Electric suggested that MSS was not running its business properly based upon the fact that it owed other material suppliers large sums of money, including at least $500,000.00 to Capital Electric. Id. at ¶ 66.  Specifically, and over the objection of at least one (1) other officers of Hunt Electric, Hunt III stated as follows: "I don't give a sh*t, you are going to pay me all the money you owe me."  Id. at ¶ 68. Hunt Electric, during the course of the April 2023 Meeting, refused any formal or informal arrangement with MSS to provide for deferred periodic payments of the outstanding balance owed, at the time, which was approximately fifty-percent (50%) less than the amount that MSS owed on March 7, 2023. Id. at ¶ 69.

Hunt Electric knew, at all times relevant hereunder, and during the April 2023 Meeting, that it possessed the ability to cause MSS to breach and be in default under each of the Construction Contracts.  Compl. [D.E. 1], at ¶¶ 70-71.  Defendant's ability to control MSS's destiny with respect to, and ability to perform, the Construction Projects, was based upon the fact that as of the April 2023 Meeting, and in connection with the Construction Projects, significant amounts of electrical materials, supplies, and products had been

12

previously ordered by MSS, and was scheduled to be delivered to each of the Construction Projects by Defendant (the "Pending MSS Material Orders"), most of which was necessary and required to complete the electrical portions of each of the Construction Projects. Id. at ¶ 72-73.  Hunt Electric knew that if it cancelled the Pending MSS Material Orders, for example, either MSS or the General Contractor would be forced to re-order the same electrical supplies and materials, and restart the six to eighteen-month window between ordering and delivery of said materials to the Construction Projects.  Id. at ¶ 73.  Utilizing this leverage, and unbridled power over MSS's performance of the Construction Contracts, Hunt Electric approached the General Contractors for the Construction Projects, demanding payment of all amounts associated with the materials, supplies, and products that had been purchased by MSS and associated with the Construction Project, including those amounts associated with the Pending MSS Material Orders, or else the Pending MSS Material Orders would be cancelled and terminated. Id. at ¶ 73.

The General Contractors, including TDK, Clayton, and NVC, were forced to comply with the demands made by Hunt Electric[7] and, in turn, paid all amounts due and owing for materials, supplies, and products that had been purchased by MSS and furnished to for their respective Construction Projects.

Based upon the statement made by Hunt III at the April 2023 Meeting, Hunt Electric

---

[7] Each of the General Contractors understood, as did Hunt Electric, that if Hunt Electric cancelled and terminated the Pending MSS Material Orders additional and unnecessary delays of a minimum of three (3) to six (6) months would be added to each of the Construction Projects. Compl. [D.E. 1], at ¶ 74.

employed whatever means necessary to collect the remainder of those amounts purportedly owed by MSS, including but not limited to: (a) Threating to cancel—as a means to secure full payment from MSS and/or the General Contractors associated with the Construction Projects, the Pending MSS Material Orders, which would cause additional and unexpected construction delays due to the shortage and lead times associated with the underlying materials and supplies ordered and yet to be delivered by Hunt Electric; and (b) Refusing to release to MSS materials and supplies that MSS had purchased, for which full payment had been remitted to Hunt Electric.  Compl. [D.E. 1], at ¶ 76.  Hunt Electric's actions were malicious as evidenced by the fact that, in connection with any large order of commercial electrical equipment, supplies, or products, such as the Pending MSS Material Orders, Defendant has never required or forced payment of the entire amount as a condition for maintaining and/or not cancelling the underlying order.  Id. at ¶ 79.

Hunt Electric, likewise, and with the intent to deceive the General Contractors, provided false and misleading information concerning MSS's ordering of materials, supplies, and products for the Construction Projects, stating, suggesting and implying that said materials, supplies, and products that were necessary for the Construction Projects had not been, in fact, ordered by MSS.  Id. at ¶ 77.  Hunt Electric undertook the foregoing actions maliciously and without any legitimate purpose, other than to cripple the business operations of MSS and cause the General Contractors to terminate the Construction Contracts.  Id. at ¶ 78.

Each and every action taken by Hunt Electric, following the March 7, 2023 Phone Conference and continuing through and after the April 2023 Meeting, was to cause

significant damage to MSS, financially and professionally, within the construction industry, by forcing and inducing the mass termination of a majority of the Construction Contracts that MSS had and relied upon in order to generate revenue and income. Compl. [D.E. 1], at ¶ 80. Clayton, on July 10, 2023, and as a direct result of the direct and indirect demands and threat made by Defendant, including requiring payment for the Pending MSS Material Orders that had yet to be delivered, Clayton terminated the Clayton Construction Contract with MSS. Id. at ¶ 81. Moreover and based upon the actions and conduct and interference of Defendant, including the threatened cancellation of the MSS Pending Material Orders associated with the various Construction Projects and overreaching payment demands and requirements imposed by Hunt Electric that they were forced to adhere to: (a) NVC terminated the NVC Construction Contract on July 6, 2023; (b) TDK terminated the TDK Construction Contract on July 11, 2023; (c) CCC terminated the 2021 CCC Construction Contract on June 28, 2023; and (d) CCC terminated the 2023 CCC Construction Contract on August 17, 2023, less than sixty (60) days after it was executed. Id. at ¶¶ 82-83. Specifically, TDK's termination of the TDK Construction Contract was, in part, based upon the false, untrue, inaccurate, and contradictory information that was maliciously supplied by Hunt Electric to TDK for the purpose of inducing TDK to terminate the TDK Construction Contract with MSS. Id. at ¶ 83.

In total, and during the one-year period preceding the Petition Date (the "Insider Preference Period"), Hunt Electric received transfers and payments from MSS and/or third parties that represented amounts that were due and owing to MSS, totaling $2,749,405.15

15

(the "Transfers").  Compl. [D.E. 1], at ¶ 84 & Ex. 3.[8]   None of the Transfers that were made to Hunt Electric were within the ordinary course of business between MSS and Hunt Electric and, in fact, were fueled by Defendant's exercise of influence, control, and manipulation of MSS arising from the complete and utter dependence that MSS had upon Hunt Electric for furnishing and delivering materials necessary for the performance of the Construction Contracts and for the Construction Projects.  Id. at ¶ 86.

On the dates that each of the Transfers were made to Hunt Electric (collectively, the "Transfer Dates"), it held an unsecured debt and claim against MSS, arising from electrical materials and supplies that were previously ordered, delivered, and invoiced for, *inter alia*, the Construction Projects.  Compl. [D.E. 1], at ¶ 87.  On each of the Transfer Dates, Hunt Electric had not exercised or asserted any of its lien rights under Chapter 44A of the North Carolina General Statutes. Id. at ¶ 88.

MSS, on each of the Transfer Dates, was insolvent as its liabilities  exceeded the value of its assets.  Specifically, and as of the Petition Date, the liabilities of MSS ($2,122,230.76), exceeded the value of its assets and property ($981,509.93), by at least $1,140,720.83.  Id. at ¶¶ 89-90; accord Schedules and Statement of Financial Affairs [D.E. 56], In re MSS, Inc., BK Case No. 23-2487-5-JNC (Bankr. E.D.N.C. Aug. 28, 2025).  The The Debtor's liabilities, as a result, exceeded the value of its assets and property on each

---

[8] The Transfer occurring on July 21, 2023, in the amount of $275,000.00, was made to Defendant by NVC, the General Contractor for the Meridian at Rogers Branch Project, and represented amounts that were due and owing to MSS pursuant to the NVC Construction Contract, and applied by Defendant towards the outstanding balance purportedly owed by MSS to Defendant for electrical materials, goods, supplies, and products furnished for the Meridian at Rogers Branch Project.  Id. at ¶ 85.

of the Transfer Dates (or when each of the Transfers occurred). Id. at ¶ 89-90.

During four-year period preceding the filing of the Bankruptcy Case, Hunt Electric was the sole and exclusive electrical supplier for MSS, including Construction Projects for which MSS was serving as a subcontractor and responsible for furnishing electrical supplies, materials, products, and goods as part of its underling scopes of work.

Defendant is a corporation which provides commercial and residential electrical services to construction projects through North Carolina and South Carolina. Compl. [D.E. 1], at ¶ 2. Defendant is a "creditor" of the Debtor, as that term is defined under § 101(10)(A) of the Bankruptcy Code, as Defendant holds a claim against the Debtor that arose prior to the commencement of the above-captioned bankruptcy proceeding and from the construction services performed and materials, supplies, and goods furnished by Defendant to the Debtor in the State of North Carolina. Id. at ¶¶ 6.

Prepetition, and within ninety (90) days of the Petition Date (the "Preference Period"), the Debtor remitted payments to, or for the benefit of, Defendant, totaling $40,810.00, and drawn upon the Debtor's bank account at Truist Bank, Account No. **********3020, (the "Bank Account"), which are summarized as follows:

17

| | | | | |
|---|---|---|---|---|
| Truist Bank (***3020) | 24671 | 5/28/2023 | 6/9/2023 | $11,450.00 |
| Truist Bank (***3020) | 24690 | 7/7/2023 | 6/20/2023 | $14,680.00 |
| Truist Bank (***3020) | 24734 | 7/17/2023 | 7/18/2023 | $14,680.00 |
| **TOTAL** | | | | **$40,810.00** |

(collectively, the "Transfers"). Compl. [D.E. 1], at ¶ 16.

The Transfers represented payments for, and were applied towards the outstanding balance of, indebtedness owed to Defendant for electrical supplies, materials, and goods that were purchased by, and invoiced to, the Debtor for various subcontracting services provided by the Defendant for construction projects throughout the State of North Carolina and the State of South Carolina.  Id. at ¶¶ 17-18.

In addition to being presumed insolvent on each of the days in the Preference Period, see 11 U.S.C. §547(f), the Debtor's total liabilities exceeded the value of its assets and property on dates that the Transfers occurred.  Compl. [D.E. 1], at ¶¶ 20-21.  Specifically, the Debtor's liabilities ($2,122,230.76) exceeded the value of its assets and property ($981,509.93), by at least $1,140,720.83, as of the Petition Date, as well as on the dates that each of the Transfers occurred. Id. at ¶¶ 21-23.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a) states that every pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2); Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 n.3 (2007) ("Rule 8(a) 'contemplate[s] the statement of circumstances, occurrences, and events in support of the

claim presented' and does not authorize a pleader's 'bare averment that he wants relief and is entitled to it.'" (citation omitted)).  To withstand a motion to dismiss under Fed. R. Civ. P. 12(b)(6), and demonstrate entitlement to relief, a pleading must include "enough facts to state a claim to relief that is plausible on its face." Id. at 555 (emphasizing that a pleading providing "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)).

A claim has facial plausibility when the pleaded factual content allows the reasonable inference to be drawn that the defendant is liable for the misconduct alleged. Twombly, 550 U.S. at 556.  The veracity of well–pleaded allegations in the complaint will be assumed in determining "whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. 662, 667 (2009).  In evaluating whether the pleading is sufficient, only well-pleaded facts are construed liberally in the non-movant's favor: "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." Jackson v. BellSouth Telecomms., 372 F.3d 1250, 1262 (11th Cir. 2004) (citation omitted); Shore Markets, Inc. v. J.P. Assocs. Ltd., 213 F.3d 175, 180 (4th Cir. 2000).

19

# ARGUMENT

**A. MSS HAS PLAUSIBLY ALLEGED AND DEMONSTRATED THAT THE TRANSFERS MADE TO HUNT ELECTRIC, TOTALING $2,749,405.15 ARE AVOIDABLE AND RECOVERABLE AS PREFERENTIAL TRANSFERS TO A NON-STATUTORY INSIDER UNDER §§ 547(b) AND 550 OF THE BANKRUPTCY CODE.**

Section 547(b) of the Bankruptcy Code, setting forth the requirements for avoidance of preferential transfers, provides as follows:

(b) Except as provided in subsections (c) and (i) of this section, the trustee may, based on reasonable due diligence in the circumstances of the case and taking into account a party's known or reasonably knowable affirmative defenses under subsection (c), avoid any transfer of an interest of the debtor in property—

> (1) to or for the benefit of a creditor;
>
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3) made while the debtor was insolvent;
>
> (4) made—
>
> > (A) on or within 90 days before the date of the filing of the petition; or
> >
> > (B) *between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider*; and
>
> (5) that enables such creditor to receive more than such creditor would receive if—
>
> > (A) the case were a case under chapter 7 of this title;
> >
> > (B) the transfer had not been made; and
> >
> > (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

20

11 U.S.C. § 547(b) (emphasis added).

1. **MSS HAS PLAUSIBLY DEMONSTRATED THAT HUNT ELECTRIC WAS A NON-STATUTORY INSIDER UNDER § 547(B)(4)(B) SUCH THAT TRANSFERS MADE TO HUNT ELECTRIC WITHIN THE ONE-YEAR PERIOD PRECEDING THE PETITION DATE ARE SUBJECT TO AVOIDANCE AS PREFERENTIAL TRANSFERS.**

The term "insider," as it relates to a corporate debtor, is defined in § 101(31)(B) of the Bankruptcy Code to include the following: "(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor." 11 U.S.C. § 101(31)(B).  "Determining whether an entity is an insider is a question of fact, which must be determined on a case-by-case basis." In re N. Outer Banks Assocs., LLC, No. 10-01292-8-RDD, 2010 Bankr. LEXIS 3974, at *3-4 (Bankr. E.D.N.C. Nov. 8, 2010) (citing In re Broumas, Nos. 97-1183 & 97-1182, 1998 U.S. App. LEXIS 3070, 1998 WL 77842, at *7 (4th Cir. 1998)); accord Browning Interests v. Allison, 955 F.2d 1008, 1011 (5th Cir. 1992)).

The definition of "insider" in § 101(31) of the Bankruptcy Code, however, is "illustrative rather than exhaustive." Longview Aluminum, L.L.C. v. Brandt, 431 B.R. 193, 196 (N.D. Ill. 2010) (citing In re Krehl, 86 F.3d 737, 741-42 (7th Cir. 1996)), and "[b]y defining an "insider" as a non-exhaustive list of entities, § 101(31) "creates (but does not define) what is known as a "nonstatutory insider." Angell v. Meherrin Agric. & Chem. Co. (In re Tanglewood Farms, Inc.), Nos. 10-06719-8-JRL, 12-00186-8-JRL, 2013 Bankr. LEXIS 1849, at *46 (Bankr. E.D.N.C. May 1, 2013) (citations omitted);  Lynch v. Winslow

21

(In re Winslow), 473 B.R. 94, 101 (E.D.N.C. 2012); Smith v. Porter (In re Carr & Porter, LLC), 416 B.R. 239, 254 (Bankr. E.D. Va. 2009) ("Because the statutory language merely 'includes' types of persons deemed to be insiders, courts have found these categories nonexhaustive.").

A non-statutory insider is "any person or entity whose relationship with the debtor is sufficiently close so as to subject the relationship to careful scrutiny." Butler v. David Shaw, Inc., 72 F.3d 437, 443 (4th Cir. 1996). Identification of a non-statutory insider is determined by "a factual inquiry into the closeness of the relationship between the parties and whether the transaction between the transferee and debtor was conducted at 'arm's length.'" In re Three Flint Hill Ltd. P'ship, 213 B.R. 292, 297-98 (D. Md. 1997) (emphasizing that although control is certainly probative of an insider relationship, it is not required for an entity to be considered a non-statutory insider); Northern Outer Banks, 2010 Bankr. LEXIS 3974, at *4) (observing that a non-statutory insider "encompasses anyone with a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor." (citations omitted)); Broumas, 1998 U.S. App. LEXIS 3070, at *21; Krehl, 86 F.3d at 741.

In order to plausibly demonstrate an entity is a non-statutory insider, at the pleadings stage, "a complaint need only to 'raise the possibility that the Defendant was an insider of the debtor at the time of the payments above the speculative level.'" In re Oconee Reg'l Health Sys., Inc., 621 B.R. 64, 78 (Bankr. M.D. Ga. 2020); accord Fort v. Kibbey (In re Labsource, LLC), Nos. 19-05161-HB, 21-80059-HB, 2022 Bankr. LEXIS 1082, at *29 (Bankr. D.S.C. Apr. 19, 2022).

22

Creditors can be considered non-statutory insiders "on a showing that the person or entity in fact had a relationship with the debtor that was sufficiently close that the two were not dealing at arm's length." <u>Rupp v. United Sec. Bank (In re Kunz)</u>, 489 F.3d 1072, 1080 (10th Cir. 2007) (holding that a creditor of the debtor may qualify as a non-statutory insider); <u>In re The Vill. at Lakeridge, LLC</u>, 814 F.3d 993, 1001 (9th Cir. 2016) ("A creditor is not a non-statutory insider unless: (1) the closeness of its relationship with the debtor is comparable to that of the enumerated insider classifications in § 101(31), and (2) the relevant transaction is negotiated at less than arm's length." (citation omitted)); <u>Shubert v. Lucent Techs. Inc (In re Winstar Communs., Inc.)</u>, 554 F.3d 382, 399 (3d Cir. 2009); United States v. State St. Bank & Tr. Co., 520 B.R. 29, 82 (Bankr. D. Del. 2014) (holding that creditors were considered non-statutory insiders for purposes of equitable subordination under § 510 of the Bankruptcy Code).[9] As a result, and to determine whether

---

[9] Some courts have observed that control over the debtor is not a requirement for finding that a creditor is a non-statutory insider where the debtor and creditor have engaged in transactions that were not at arm's length. <u>See</u> <u>State Street Bank</u>, 520 B.R. at 81 ("A party may also be considered a 'non-statutory insider,' even without actual control of the debtor, when there is a close relationship between debtor and creditor and when transactions between them were not conducted at arm's length."); <u>Bruno Mach. Corp. v. Troy Die Cutting Co. (In re Bruno Mach. Corp.)</u>, 435 B.R. 819, 836 (Bankr. N.D.N.Y. 2010) ("[T]he court finds that the parties engaged in less than-arm's-length transactions. Therefore, the court need not reach the alternative element of control."); <u>Schubert v. Lucent Techs. Inc (In re Winstar Commc'ns., Inc.)</u>, 554 F.3d 382, 396-97 (3d Cir. 2009) ("However, a finding of such control is not necessary for an entity to be a non-statutory insider."); <u>Hirsch v. Tarricone (In re A. Tarricone, Inc.)</u>, 286 B.R. 256, 264-65 (Bankr. S.D.N.Y. 2002) ("Congress did not make control necessary for either statutory or non-statutory insider status.") (explaining rationale). "[I]nsider status must be determined on a [case-by-case] basis through examination of the totality of the circumstances and the creditor's degree of involvement in the debtor's affairs." <u>Lugo-Mender v. Gov't Commc'ns. Inc. (In re El Comandante Mgmt. Co.)</u>, 404 B.R. 47, 56 (D.P.R. 2008); <u>In re Missionary Baptist Found. of Am., Inc.</u>, 712 F.2d 206, 210 (5th Cir. 1983).

23

a creditor is a non-statutory insider for purposes of § 547(b) of the Bankruptcy Code, bankruptcy courts examine "the nature of the relationship between the debtor and the creditor, and whether that relationship, defined in terms of control or undue influence, gave the creditor the power to have its debts repaid. Damir v. Trans-Pacific Nat. Bank (In re Kong), 196 B.R. 167, 171 (N.D. Cal. 1996) (observing that "the relationship and power must be more than the debtor-creditor relationship itself."). "One-sided transactions" and the ability to coerce the debtor into entering into transactions that are not in its best interests are evidence of a relationship that is too close. See Winstar, 554 F.3d at 395.

Here, and contrary to the position advanced by Hunt Electric, actual control over MSS was not necessary or required to establish that Hunt Electric—or any other creditor—was a non-statutory insider for purposes of § 547(b) of the Bankruptcy Code.  Specifically "bankruptcy court[s] do[] not have to find actual control of the debtor by the creditor before ruling that the creditor is a non-statutory insider of the debtor. Anstine v. Carl Zeiss Meditec AG (In re U.S. Med., Inc.), 531 F.3d 1272, 1279 (10th Cir. 2008) ("A finding of actual control by the bankruptcy court would make Creditor a statutory insider and would avoid the question of whether it was a non-statutory insider altogether. Obviously, then, a bankruptcy court does not have to find actual control of the debtor by the creditor before ruling that the creditor is a non-statutory insider of the debtor."); accord Three Flint Hill, 213 B.R. at 299.  Additionally, an "arm's length transaction" is defined as follows: "1. A transaction between two unrelated and unaffiliated parties. 2. A transaction between two parties, however closely related they may be, conducted as if the parties were strangers, so that no conflict of interest arises." Transaction,

24

Black's Law Dictionary (10th ed. 2014).

The instant case is analogous to Winstar.  In Winstar, for example, the Third Circuit Court of Appeals held that Lucent Technologies, Inc. ("Lucent"), a major creditor and supplier of the debtor, Winstar Communications, Inc. ("Winstar"), was a non-statutory insider for purposes of determining the period for avoidance of preferential transfers under § 547(b)(4)(B).  In analyzing the bankruptcy court's findings, the Third Circuit observed as follows:

> Not only was Lucent both a major creditor and supplier of Winstar, but, according to the Bankruptcy Court, it had the ability to coerce Winstar into a series of transactions that were not in Winstar's best interests, such as the Software Pool transaction, the improper bill-and-hold transactions, and other purchases of unneeded equipment. Such one-sided transactions refute any suggestion of arm's-length dealings.

Id. at 399 (internal citations omitted).  Further supporting the determination that the creditor in Winstar was a non-statutory insider, was "Lucent's ability to coerce Winstar into transactions not in Winstar's interest" and "forced purchase of its goods{]" resulting in "treat[ment] . . . as a captive buyer for Lucent's goods[.]" Id. at 397.

MSS, in the instant case, has plausibly alleged and shown that Hunt Electric was a non-statutory insider of MSS when each of the Transfers occurred.  *First*, and based upon the fact that Hunt Electric was the exclusive electridcal material supplier utilized by MSS, and resulting control possessed over the ability of MSS to perform (or default) under the Construction Contracts, there was a close relationship between MSS and Hunt Electric that warrants close scrutiny.  Hunt Electric was the exclusive electrical material supplier for all of the Construction Projects in which MSS was involved, resulted in Hunt Electric having

25

significant control over MSS, at the time each of the Transfers occurred. Compl. [D.E. 1], at ¶¶ 10-11 & 18.  Moreover, and as a major and essential creditor of MSS, Hunt Electric had—and ultimately exercised—the ability to coerce MSS into making the Transfers totaling $2,749,405.15, all of which were outside the ordinary payment terms and course of dealing throughout their relationship.  This close relationship with MSS enabled Hunt Electric to obtain, and exercise significant control over MSS and its decision-making relating payment of the outstanding amounts owed to Hunt Electric for electrical materials and supplies, including the Non-Invoiced Transactions, and ability to perform under the existing Construction Contracts that it had  close relationship and underlying control that Hunt Electric possessed over MSS, moreover, caused MSS to make the Transfers, all of which benefited and preferred Hunt Electric over other creditors and resulted in little or no pecuniary benefit to MSS.  The allegations, as a result, plausibly demonstrate a close relationship between MSS and its major creditor and electrical material supplier, Hunt Electric, at the time each of the Transfers were made.

*Second*, and as alleged and demonstrated in the Complaint, the Transfers were not the result of arms' length transactions between MSS and Hunt Electric.  On the contrary, each of the Transfers were the result of threats, both direct and indirect, made by Hunt Electric and each were the result of the imposition of unreasonable and overreaching payment demands made by Hunt Electric, including but not limited to the demand for payment of the sum of $400,000.00 within seventy-two (72) hours during the March 7, 2023 Phone Conference. Each and every interaction, communication, and dealings between MSS and Hunt Electric, from discovery of the Non-Invoiced Transactions through

26

the Petition Date, were inherently coercive and evidence the exertion of undue influence and control over MSS by Hunt Electric for its own pecuniary benefit and to the determinant of MSS.  See, e.g., In re Schuman, 81 B.R. 583, 586 (9th Cir. B.A.P. 1987) ("The tests developed by the courts in determining who is an insider focus on the closeness of the parties and the degree to which the transferee is able to exert control or  influence over the debtor.").  As demonstrated by the circumstances, each of the Transfers were not the result of an arms length transaction and, instead, the result of Hunt Electric ability to coerce MSS into making the Transfers that were not in its best interest.

The Transfers, a substantial portion of which were received by Hunt Electric between February 16, 2023, and July 21, 2023, were not arms-length transactions between MSS and Hunt Electric, nor were any conducted in accordance with the ordinary course of dealing and terms that had previously defined their relationship.  The demand made by Hunt Electric for immediate payment, lduring the March 7, 2023 Phone Conference, and subsequent remittance to Hunt Electric of the sum of $958,088.70 in Transfers between March 10, 2023, and April 24, 2023, were not arms' length transactions between MSS, as the customer, and Hunt Electric, as the creditor-supplier. See Compl. [D.E. 1], at ¶¶ 46-63 & 65-74.

Construed in a light most favorable to MSS, as the non-moving party, the Complaint plausibly raises, alleges, and/or demonstrates the possibility that Hunt Electric—at the time it received the Transfers totaling $2,749,405.15—was a non-statutory insider of the Debtor, such that said Transfers were made to Hunt Electric by the Debtor as a result of the closeness in the relationship between MSS and Hunt Electric and the resulting control and

27

influence that Hunt Electric possessed (and ultimately exercised) over the business operations, decision-making, and financial affairs of MSS.   Other than Hunt Electric possessing and threatening to exercise its control over MSS both financially and operationally, including causing MSS to default under the Construction Contracts, there is no legitimate or reasonable justification for MSS remitting the sum of $958,088.70 to Hunt Electric between March 10, 2023, and April 24, 2023. Here, and as observed by the Fourth Circuit in Bulter, the relationship between MSS and Hunt Electric, is sufficiently close so as to subject the relationship, and $2,749,405.15 in Transfers made within the one-year period preceding the Petition Date, to careful scrutiny. 72 F.3d at 443.  Hunt Electric, as its largest creditor and sole/exclusive supplier of electrical materials for the Construction Projects, possessed and exercised sufficient control over the MMS that resulted in the preferential and non-customary payment of a substantial portion of its preexisting indebtedness, including the Non-Invoiced Transactions, within the one-year period preceding the Petition Date.

Based upon the foregoing, given that the determination of whether Hunt Electric is, in fact, a non-statutory insider, is a factual determination, see Oconee Reg'l Health Sys., 621 B.R. at 78, the Motion to Dismiss should be denied, as the allegations in the Complaint plausibly demonstrate entitlement to relief for avoidance and recovery of the Transfers as preferential under § 547(b) of the Bankruptcy Code.

**2. MSS HAS PLAUSIBLY DEMONSTRATED THAT EACH OF THE TRANSFERS WERE A TRANSFER MADE, WHILE INSOLVENT AND TO HUNT ELECTRIC ON ACCOUNT OF AN ANTECEDENT DEBT, WHICH ENABLED HUNT ELECTRIC TO RECEIVE MORE THAN IT WOULD HAVE RECEIVED UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.**

To avoid a transfer as preferential under § 547(b) of the Bankruptcy Code, a claimant must show, as a threshold matter, that there was a "transfer . . . of an interest of the debtor in property . . . ." 11 U.S.C. § 547(b).   A "transfer" is "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with (i) property; or (ii) an interest in property." 11 U.S.C. § 101(54)(D). Although the Bankruptcy Code, does not define the phrase an "interest of the debtor in property," however, the Supreme Court held in Begier v. IRS, that property of the debtor, as it applies to avoidance actions, is to be construed as property of the estate within the meaning of § 541 of the Bankruptcy Code. 496 U.S. 53, 58 (1990); accord Besing v. Hawthorne (In re Besing), 981 F.2d 1488, 1493 (5th Cir. 1993) ("An interest in property, . . .  includes any interest of the debtor that would have been preserved for the benefit of the bankruptcy estate but for the alleged transfer." (citing In re Stevens, 112 B.R. 175, 177 (Bankr. S.D. Tex. 1989)).

Each of the Transfers for which is avoidance and recovery is sought by MSS, constitute "transfer of an interest of the debtor in property," as required by § 547(b) of the Bankruptcy Code.  The Transfers are comprised of several payments made by the Debtor, to Hunt Electric, through checks drawn upon financial accounts owned by MSS, and subsequently negotiated by MSS, or from amounts owed to MSS by third parties under the

29

Construction Contracts. MSS, as a result of the Transfers, departed with the sum of $42,749,405.15.

Each transfer, subject to avoidance under § 547(b) of the Bankruptcy Code, must also be made within ninety (90) before the filing of the bankruptcy case, on account of an "antecedent debt," and to or for the benefit of a creditor. 11 U.S.C. §§ 547(b)(1)-(2) & 547(b)(4)(A).  Courts have held and observed, that "'the nature and amount of the antecedent debt' was necessary to show entitlement to relief under a preferential transfer theory. Angell v. Etheridge (In re Caremerica, Inc.), AP No. L-08-00164-8-JRL, slip op., at 5-6 (Bankr. E.D.N.C. July 28, 2009) (citations omitted); accord In re Valley Media, Inc., 288 B.R. 189, 192 (Bankr. D. Del. 2003).  Judge Leonard, in Etheridge, also concluded that to satisfy the requirements imposed by § 547(b)(1) of the Bankruptcy Code, that the transfer was made to or for the benefit of a creditor, one must provide "information as to the dates, amounts, and number of transfers."  AP No. L-08-00164-8-JRL, slip op., at 5

The allegations of the Complaint clearly and unequivocally demonstrate that all of the Transfers were made within the one-year period preceding the Petition Date.  MSS has established, and the Court must accept as true, that each of the Transfers were made in payment of "antecedent debts" owed to Hunt Electric, that arose prior to the dates that each of the Transfers occurred, and were the result of electrical materials, supplies, and other goods purchased from Hunt Electric.

With respect to the requirement imposed by § 547(b)(3) of the Bankruptcy Code, that each transfer be "made while the debtor was insolvent[,]" the Bankruptcy Code defines "insolvency" as the "financial condition such that the sum of such entity's debts is greater

than all of such entity's property, at a fair valuation . . . ." 11 U.S.C. § 101(32)(A). To determine a debtor's insolvency, courts in the Fourth Circuit apply the "balance sheet test" which requires accessing "whether the debtor was insolvent when the transfer was made . . . comparing . . . the fair market value of the debtor's assets at the time of the transaction with the debtor's liabilities on the same date." Matson v. Strickland (In re Strickland), 230 B.R. 276, 281 (Bankr. E.D. Va. 1999) (citation omitted); Angell v. Augusta Seed Corp. (In re Tanglewood Farms, Inc. of Elizabeth City), AP No. 12–00193, 2013 WL 474704, at *3 (Bankr. E.D.N.C. Feb. 7, 2013).

Courts, in this district, have traditionally and uniformly utilized a debtor's egregious insolvency as of the petition date in determining whether a debtor was insolvent on the dates of transfers that occurred within the ninety-day period preceding the filing of the underlying bankruptcy case. See, e.g., Angell v. Montague Farms, Inc. (In re Tanglewood Farms, Inc. of Elizabeth City), No. 12–00202–8–JRL, slip op., at 9-11 (Bankr. E.D.N.C. Apr. 15, 2013) (citations omitted); Angell v. Meherrin Agricultural & Chemical Co. (In re Tanglewood Farms, Inc. of Elizabeth City), AP No. 12–00186, 2013 WL 1405729, at *6-7 (Bankr. E.D.N.C. Apr. 8, 2013); Angell v. Endcom, Inc. (In re Tanglewood Farms, Inc. of Elizabeth City), 2013 WL 692975 (Bankr. E.D.N.C. Feb. 26, 2013); Augusta Seed, 2013 WL 474704, at *3 (stating that a debtor's schedules, filed at the petition date, are taken into consideration when "determining the plausibility of a debtor's insolvency at the time of earlier transfers." (citation omitted)); Angell v. First Eastern, LLC (In re Caremerica, Inc.), AP No. 08–00157, 2011 WL 1457223, at *3 (Bankr. E.D.N.C. Apr. 15, 2011) (finding that transfers made approximately seven months prior to the petition date were made while the

debtor was insolvent, based on its schedules that listed total assets of $9,842.69 compared to total liabilities of $4,686,715.94 and claims of $15,823,184.00); cf. Oliver v. Cooper (In re Bateman), AP No. 11–00387, 2012 WL 1110080, at *2–3 (Bankr. E.D.N.C. Apr. 2, 2012) (refusing to allow the debtor's insolvency on the petition date, where total liabilities exceeded the total value of his assets by approximately $60,000.00, to demonstrate and illustrate that the debtor was insolvent on the transfer date that was two (2) years prior to the petition date) (hereinafter "Cooper I"); Oliver v. Cooper (In re Bateman), AP No. 11–00387, 2012 WL 3061181, at *3 (Bankr. E.D.N.C. July 26, 2012) (hereinafter "Cooper II").

MSS, pursuant to § 547(f) of the Bankruptcy Code, is presumed to be insolvent on those dates that the Transfers occurred within the ninety-day period preceding the filing of the Bankruptcy Case. 11 U.S.C. § 547(f).  Aside from the aforementioned presumption, and with respect to those Transfers occurring more than ninety (90) days prior to the Petition Date, and similar to First Eastern, Augusta Seed, as well as other relevant decisions in this district, the Debtor's egregious insolvency, where its liabilities ($2,122,230.76), exceeded the value of its assets and property ($981,509.93), by at least $1,140,720.83, as of the Petition Date, demonstrates that the Debtor was insolvent on the dates that each of the Transfers to Defendant occurred (June 9, 2023, June 20, 2023, and July 18, 2023) (collectively, the "Transfer Dates"). Compl. [D.E. 1], at ¶¶ 89-92.   This analytical framework and the record in the instant case, including the Official Form 206Sum, entitled "Summary of Assets and Liabilities for Non-Individuals," which was filed along with the Schedules [B.K. D.E. 32], the insolvency of the Debtor on August 28, 2023, is sufficient

to establish that the Debtor's liabilities exceeded the value of its assets and property on the Transfer Dates. Id. at ¶¶ 89-92 (revealing that Debtor owned total assets of $981,509.93, and total liabilities of $2,122,230.76 as of the Petition Date).  This substantial insolvency, totaling approximately $1,140,720.83, as of the Petition Date, is sufficient to establish that the Debtor was insolvent, and its liabilities exceeded the total value of its assets on the Transfer Dates, all of which are within the ninety-day period preceding the filing of the Bankruptcy Case. See, e.g., Augusta Seed, 2013 WL 474704, at *3; First Eastern, 2011 WL 1457223, at *3.

The Bankruptcy Code also requires, as a condition of avoidance, demonstrating that the receipt of an alleged preferential transfer enabled the transferee to receive more than it would have under chapter 7 of the Bankruptcy Code, had the transfer not been made, and had the transferee received payment to the extent provided under the Bankruptcy Code. 11 U.S.C. § 547(b)(5).  "Section 547(b)(5) is a central element of the preference section because it requires a comparison between what the creditor actually received and what it would have received under [chapter 7]." 5 Collier on Bankruptcy ¶ 547.03[7] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. rev.).  "Generally, as long as the distribution to general unsecured creditors would be less than 100%, any payment to such a creditor during the preference period would enable the creditor to receive more than it would in a liquidation had the payment not been made." Etheridge, AP No. L-08-00164-8-JRL, slip op., at 6-7 (citations omitted); see In re Virginia-Carolina Fin. Corp., 954 F.2d 193, 199 (4th Cir. 1992); see also Precision Walls, Inc. v. Crampton, 196 B.R. 299, 303 (E.D.N.C. 1996) (holding that the summary of schedules demonstrating that liabilities exceeded assets

was sufficient to support the bankruptcy court's finding that unsecured creditors would receive less than 100% on their claims).

Here, as in Etheridge, MSS has demonstrated, through allegations in the Complaint, that the Debtor's liabilities ($2,122,230.76), exceeded the value of its assets and property ($981,509.93), by at least $1,140,720.83, as of the Petition Date, reported in the Official Form 206Sum, entitled "Summary of Assets and Liabilities for Non-Individuals" filed along with the Schedules [BK D.E. 32] in the Bankruptcy Case. Because the distribution to general unsecured creditors is less than 100%, the payments that were made to Hunt Electric, totaling $2,794,405.15, within the one-year period preceding the Petition Date, enabled Hunt Electric to receive more than it would in a liquidation under chapter 7 of the Bankruptcy Code. See Precision Walls, 196 B.R. at 303.

**B. MSS HAS PLAUSIBLY STATED A CLAIM AGAINST HUNT ELECTRIC FOR TORTIOUS INTERFERENCE WITH THE CONTRACTUAL RELATIONS BECAUSE IT INTENTIONALLY, AND WITHOUT JUSTIFICATION, INDUCED THE GENERAL CONTRACTORS TO TERMINATE THE EXISTING CONSTRUCTION CONTRACTS WITH MSS.**

Under North Carolina law, a claim for tortious interference with contract requires proof of five elements:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

United Lab., Inc. v. Kuykendall, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988) (citing Childress v. Abeles, 240 N.C. 667, 674, 84 S.E.2d 176, 181-82 (1954)). "In

order to demonstrate the element of acting without justification, the action must indicate no motive for interference other than malice." Area Landscaping, L.L.C. v. Glaxo-Wellcome, Inc., 160 N.C. App. 520, 523, 586 S.E.2d 507, 510 (2003) (quotation marks removed); Peoples Sec. Life Ins. Co. v. Hooks, 322 N.C. 216, 220–21, 367 S.E.2d 647, 650 (1988) ("If the defendant's only motive is a malicious wish to injure the plaintiff, his actions are not justified." (emphasis added)).

Hunt Electric, in the Motion to Dismiss, argues that the Complaint fails to plausibly establish that it "intentionally induced" termination of the Construction Contracts and that its actions were justified. These arguments are misplaced, without merit, and completely ignore the well-pled allegations advanced by Plaintiff in the Complaint.

MSS has plausibly alleged that Hunt Electric intentionally induced—through its actions and interference—the termination of the Construction Contracts between MSS and the General Contractors.  Hunt Electric, following the April 2023 Meeting, and continuing up to and through the Petition Date, knowingly, intentionally, and without privilege, justification or excuse, participated in conduct and deployed collection measures and methods that were aimed at, and did in fact induce the termination of the TDK Construction Contract, the Clayton Construction Contract, the 2021 CCC Construction Contract, the 2023 Construction Contract, and the NVC Construction Contract by TDK, Clayton, CCC, and NVC, respectively. Compl. [D.E. 1], at ¶ 145. "A person acts intentionally if he desires to cause the consequences of his act or [if] he believes the consequences are substantially certain to result." State v. Bright, 78 N.C. App. 239, 243, 337 S.E.2d 87, 89 (1985).

The Complaint, likewise, plausibly demonstrates that Hunt Electric's intentional

35

inference with the contractual relationship between MSS and the General Contractors in the Construction Contracts was without justification.  Specifically, and as illustrated by the circumstances and the allegations in the Complaint, Hunt Electric provided false and misleading information to the General Contractors associated wit hteh Construction Projects, demanded payment in full from the General Contractors, and undertook other actions relating to MSS "maliciously and without any legitimate purpose, other than to cripple the business operations of MSS and cause the General Contractors to terminate the Construction Contracts." Compl. [D.E. 1], at ¶ 78.  On the contrary, the only purpose and justification for Hunt Electric taking and deploying the measures it did after the April 2023 Meeting, was to cause significant damage to MSS, financially and professionally, within the construction industry, by forcing and inducting the mass termination of a majority of the Construction Contracts that MSS had and relied upon in order to generate revenue and income. Id. at ¶ 80. The malicious nature and lack of any justification for its actions is, likewise, illustrated by the fact that Hunt Electric never required or forced payment—in connection with any large order of commercial electrical equipment, supplies, or products, such as the Pending MSS Material Order—of the entire amount as a condition for maintaining and/or not cancelling the underlying order. Id. at ¶ 79.

The Complaint, construed in a light most favorable to MSS as the non-moving party, does not reveal any possible justification for Hunt Electric's intentional inference with the Construction Contracts between MSS and the General Contractors. For example, and as illustrated by the repeated attempts by MSS to repay the existing indebtedness that were rejected by the Hunt Electric, Here, and contrary to the arguments raised by Hunt Electric,

36

the factual allegations in the Complaint do not reveal any other possible justification for its intentional inference with the Construction Contracts other than to professionally and financially cripple MSS by forcing and inducing the General Contractors to terminate the Construction Contracts.  Cf Hooks, 322 N.C. at 220–21; Filmar Racing, Inc. v. Stewart, 141 N.C. App. 668, 675, 541 S.E.2d 733, 738 (2001).

    C.  **MSS HAS PLAUSIBLY STATED A CLAIM AGAINST HUNT ELECTRIC FOR VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT BASED UPON THE UNFAIR, DECEPTIVE, AND MISLEADING CONDUCT AND PRACTICES UNDERTAKEN AND EMPLOYED BY HUNT ELECTRIC.**

The North Carolina Unfair and Deceptive Trade Practices Act (hereinafter, the "UDPTA"), was enacted by the General Assembly, in 1969, "to provide civil legal means to maintain, ethical standards of dealings between persons engaged in business and between persons engaged in business and the consuming public within this State to the end that good faith and fair dealings . . . at all level[s] of commerce be had in this State." Bhatti v. Buckland, 328 N.C. 240, 245, 400 S.E.2d 440, 443 (1991) (citation omitted); see Marshall v. Miller, 302 N.C. 539, 543, 276 S.E.2d 397, 400 (1981); Lindner v. Durham Hosiery Mills, Inc., 761 F.2d 162, 165 (4th Cir.1985).[10]

"The elements for a claim for unfair or deceptive trade practices are: '(1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affective commerce, (3) which proximately caused actual injury to the plaintiff or to his business.'"

---

[10] Section 75-1.1 of the North Carolina General Statutes states, in relevant part: "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."  N.C. Gen. Stat. § 75-1.1.

Noble v. Hooters of Greenville (NC), LLC, 199 N.C. App. 162, 166, 681 S.E.2d 448, 452 (2009); accord Bob Timberlake Collection, Inc. v. Edwards, 176 N.C. App. 33, 41, 626 S.E.2d 315, 322–23 (2006). North Carolina courts require that the act or practice have an "adverse impact on the individual or entity deceived" in the form of actual damages. Miller v. Ensley, 88 N.C. App. 686, 691, 365 S.E.2d 11, 14 (1988).[11]

Whether a particular practice or act is unfair or deceptive is a question of law, Gray v. N.C. Ins. Underwriting Ass'n, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000), and "[a] practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." Marshall v. Miller, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981). Generally, "[e]ither unfairness or deception can bring conduct within the purview of the statute" and, as a result, "an act need not be both unfair and deceptive." Gilbane Bldg. Co.

---

[11] North Carolina courts apply a three factor analysis when assessing a claim under the UDTPA. First, there must be a practice, act, conduct, or representation that falls within the definition of "unfair" or "deceptive." Marlen C. Robb & Son Boatyard & Marina, Inc. v. Vessel Bristol, 893 F. Supp. 526, 540 (E.D.N.C. 1994); Canady v. Mann, 107 N.C. App. 252, 260, 419 S.E.2d 597, 602 (1992). Second, North Carolina courts require that the act or practice was in or affecting commerce. Spartan Leasing, Inc. v. Pollard, 101 N.C. App. 450, 460, 400 S.E.2d 476, 480 (1991). Third, and finally, North Carolina courts require that the act or practice have an "adverse impact on the individual or entity deceived" in the form of actual damages. See Miller v. Ensley, 88 N.C. App. 686, 691, 365 S.E.2d 11, 14 (1988).

v. Fed. Res. Bank of Richmond, 80 F.3d 895, 903 (4th Cir. 1996) (citing Rucker v. Huffman, 99 N.C. App. 137, 392 S.E.2d 419, 421 (1990)).

"A practice is unfair [for purposes of establishing liability pursuant to N.C. Gen. Stat. § 75-1.1] when it offends established public policy as well as when the practice is immoral, unethical, oppressive,  unscrupulous, or substantially injurious to consumers." Marshall v. Miller, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981) ("[T]the fair or unfair nature of particular conduct is to be judged by viewing it against the background of actual human experience and by determining its intended and actual effects upon others." (citing Johnson v. Insurance Co., 300 N.C. 247, 263, 266 S.E. 2d 610, 621 (1980))), *overruled in part on other grounds*, Myers & Chapman, Inc. v. Thomas G. Evans, Inc., 323 N.C. 559, 569, 374 S.E.2d 385, 391-92 (1988); Harrington Mfg. Co. v. Powell Mfg. Co., 38 N.C. App. 393, 248 S.E.2d 739, 746 (1978) (describing unfairness as "conduct 'which a court of equity would consider unfair.'" (citation omitted)); McDonald Bros., Inc. v. Tinder Wholesale, LLC, 395 F. Supp. 2d 255, 269 (M.D.N.C. 2005) ("'Unfairness' is a broader concept than, and includes the concept of, 'deception.'" (citation omitted)).  In Harrington, for example, the North Carolina Court of Appeals described unfairness under the UTPA as follows:

> [C]onduct "which a court of equity would consider unfair." Extract Co. v. Ray, [221 N.C. 269] 20 S.E.2d 59, 61 (1942). Thus viewed, the fairness or unfairness of particular conduct is not an abstraction to be derived by logic. Rather, the fair or unfair nature of particular conduct is to be judged by viewing it against the background of actual human experience and by determining its intended and actual effects upon others.

38 N.C. App. 393, 248 S.E.2d 739, 746 (1978).  McDonald Bros., Inc. v. Tinder Wholesale, LLC, 395 F. Supp. 2d 255, 269 (M.D.N.C. 2005) ("'Unfairness' is a broader concept than, and includes the concept of, 'deception.'" (citation omitted)).

Acts and practices are deceptive, on the other hand,  if they "possess[ ] the tendency or capacity to mislead, or create[ ] the likelihood of deception." Chastain v. Wall, 78 N.C. App. 350, 337 S.E.2d 150, 154 (1985); accord Bartolomeo v. S.B. Thomas, Inc., 889 F.2d 530, 534-35 (4th Cir. 1989).  Even a truthful statements can be deceptive, if they have the capacity or tenancy to deceive." Christian, 78 N.C. App. at 356, 337 S.E.2d at 154; see Johnson v. Phoenix Mut. Life Insurance Co., 300 N.C. 247, 265, 266 S.E.2d 610, 622 (1980) ("Though words and sentences may be framed so that they are literally true, they may still be deceptive.").  As a result, the test for determining whether a particular act or practice is deceptive, for purposes of the UTPA, is whether the act "possesse[s] the tendency or capacity to mislead, or create[s] the likelihood of deception." Compton v. Kirby, 157 N.C. App. 1, 20, 577 S.E.2d 905, 917 (2003).

"[G]enerally, proof of an independent tort is sufficient to make out a separate [section 75-1.1] claim."  Reid Pointe, LLC v. Stevens, No. 08 CVS 4304, 2008 WL 3846174, at *7 (N.C. Bus. Ct. Aug. 18, 2008). Specifically, North Carolina courts have recognized that a claim for tortious interference with contract may form the basis of a claim for violation of the UDTPA. See, e.g., United Lab., Inc. v. Kuykendall, 322 N.C. 643, 665, 370 S.E.2d 375, 389 (1988) (noting that tortious interference with contract may support a claim for unfair or deceptive trade practices);.Drouillard v. Keister Williams Newspaper Servs., Inc., 108 N.C. App. 169, 172-73, 423 S.E.2d 324, 326-27 (1992); Bldg. Ctr., Inc.

40

v. Carter Lumber, Inc., 2016 NCBC LEXIS 79, at *30 (N.C. Super. Ct. Oct. 21, 2016), S. Fastening Sys. v. Grabber Const. Prods., Inc., 2015 NCBC LEXIS 42, *28 (N.C. Super. Ct. 2015).

The Complaint in the instant case contains sufficient allegations to plausibly demonstrate that Hunt Electric, through its actions and conduct, engaged in unfair and deceptive conduct, which was in an affecting commence, and resulted in significant injury to MSS.  *First*, as explained above, Hunt Electric's tortious interference with the contractual relations between MSS and the General Contractors, under which it induced the termination of the Construction Contracts associated with the Construction Projects, is sufficient to support and plausibly demonstrate a violation of the UDTPA. See Kuykendall, 322 N.C. at 665, 370 S.E.2d at 389.   MSS, in fact, alleged and asserted that Hunt Electric violated by UDTPA by "[i]ntentionally inferring with, and causing the termination of, a majority of the Construction Contracts that MSS had with General Contractors[.]" Compl. [D.E. 1], at ¶ 160(D).

*Second*, in addition, MSS has plausibly alleged that Hunt Electric utilized unfair, deceptive, and unscrupulous practices in connection with the collection of those amounts outstanding and owed by MSS for electrical materials, supplies, and goods purchased. Specifically, and as alleged in the Complaint, Hunt Electric engaged in the following unfair and deceptive practices, each of which constitute unfair, coercive, deceptive, and unscrupulous acts and practices in violation of the UDPTA: (1) Conveying false and misleading information to General Contractors relating to MSS and the Pending MSS Material Orders, which it knew or should have known would result in termination of the

41

Construction Contracts between General Contractors and MSS; (2) Withholding and failing to disclose to MSS, for at least eight (8) months, the correct and accurate amount of indebtedness owed for electrical materials and supplies that were purportedly purchased by MSS; (3) Deceptive, unfair, and overreaching conduct, and control exercised over MSS and its business operations and financial affairs, which coerced MSS into remittance of a significant portion of the Transfers to Hunt Electric. Compl. [D.E. 1], at ¶¶ 32-83 & 160. As explained herein, Hunt Electric's overreaching, unscrupulous, and unfair conduct, resulted in MSS being coerced and forced into remitting the Transfers to the detriment of MSS and its other remaining creditors. Courts of equity, as in Harrington, would consider the actions and conduct that were deployed by Hunt Electric, in this situation and aimed at pecuniary gain, unfair under the circumstances.

*Third*, and on account of Hunt Electric's unfair and deceptive practices, MSS sustained substantial damages, including lost income, revenue and profit on account of the termination of the TDK Construction Contract, the CCC Construction Contracts, the Clayton Construction Contract, and the NVC Construction Contract, loss of opportunities, damage to business reputation, and the costs and expenses associated with having to seek relief under the Bankruptcy Code to prevent a complete shutdown of its business operations. Compl. [D.E. 1], at ¶ 161.

## CONCLUSION

Based upon the foregoing, and for the reasons set forth herein, the Motion to Dismiss should be **DENIED** as the allegations contained in the Complaint plausibly state claims for relief against Hunt Electric for, *inter alia*: (1) Avoidance and recovery of transfers made

42

to Hunt Electric as a non-statutory insider totaling $2,749,405.15, as preferential transfers pursuant to under § 547(b) of the Bankruptcy Code; (2) Actual, compensatory and punitive damages against Hunt Electric for tortious interference with contractual relations; and (3) Actual, compensatory, and treble damages, and reasonable attorneys' fees, costs, and expenses under N.C. Gen. Stat. § 75-16.1, based upon Hunt Electric's violations of the UDTPA.

Respectfully submitted this, the 9th day of July, 2025.

**BUCKMILLER & FROST, PLLC**

BY:   s/Joseph Z. Frost

JOSEPH Z. FROST
NCSB No. 44387

4700 Six Forks Road, Suite 150
Raleigh, North Carolina 27609
T: (919) 296-5040
F: (919) 977-7101

Counsel for Plaintiff MSS, Inc.

43

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he is, and at all times hereinafter mentioned was, more than eighteen (18) years of age, that on this day, a true and accurate copy of the foregoing **MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS** was electronically filed utilizing the CM/ECF system, notification of which was remitted to all registered ECF participants in the above-captioned adversary proceeding.

Executed this, the 9th day of July, 2025.

s/Joseph Z. Frost
JOSEPH Z. FROST
NCSB No. 44387
jfrost@bbflawfirm.com
BUCKMILLER & FROST, PLLC
4700 Six Forks Road, Suite 150
Raleigh, North Carolina 27609