**SO ORDERED.**

**SIGNED this 2 day of September, 2025.**

_____
**Joseph N. Callaway**
**United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF NORTH CAROLINA
# RALEIGH DIVISION

IN RE:

MSS, INC.,                                               Case No. 23-02487-5-JNC
                                                         Chapter 11
    Debtor.

_____

MSS, INC.,

    Plaintiff,

v.                                                       Adv. Pro. No. 25-00045-5-JNC

HUNT ELECTRIC SUPPLY
COMPANY,

    Defendant.

## ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

The matter before the court is the Motion to Dismiss (Dkt. 10, the "Motion") and accompanying Memorandum in Support (Dkt. 11) filed by defendant Hunt Electric Supply Company ("Hunt" or "Defendant"). The Motion seeks to dismiss all five claims contained in the complaint filed in this adversary proceeding by MSS, Inc. ("MSS" or "Plaintiff") on February

28, 2025 (Dkt. 1, the "Complaint"). MSS opposed the Motion in its Memorandum of Law (Dkt. 17, the "Response") filed July 9, 2025. Hunt filed a reply brief on July 23, 2025 (Dkt. 19).

Argument was heard on August 6, 2025 in Greenville, North Carolina (the "Hearing"). Joseph Z. Frost appeared on behalf of MSS, and James S. Livermon III appeared for Hunt. At the conclusion of the Hearing, the court announced that Claim One was partially dismissed, Claim Two was dismissed in its entirety, and Claim Three was dismissed to the extent Count One was partially dismissed. The court took the remaining matters, Claims Four and Five, under advisement. This order addresses all claims.

## JURISDICITON

The court has jurisdiction over the parties and the subject matter in this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334, and the General Order of Reference entered by the United States District Court for the Eastern District of North Carolina on August 3, 1984. The court has constitutional authority to hear and enter a final decision in this contested matter. *Wellness Int'l Network, Ltd., v. Sharif*, 575 U.S. 665, 683, 135 S. Ct. 1932, 1947 (2015).

## FACTUAL BACKGROUND[1]

MSS is a North Carolina corporation that subcontracts and provides commercial and residential electrical construction and services on projects throughout North Carolina and South Carolina. Hunt is a North Carolina corporation that acts as a wholesale distributor and seller of electrical supplies and materials in the same area. Hunt was the primary electrical supplier for MSS, as historically MSS purchased nearly all of its project electrical materials, supplies, products, and goods for construction projects from Hunt.

All pertinent sales and actions material to the present case occurred in North Carolina as MSS bought its supplies through engagement at the Durham, N.C., branch of Hunt, where Mr.

---

[1] These facts are a fair recitation of the allegations in the Complaint, viewed in the light most favorable to Plaintiff.

Moses Jacobs served as its primary point of contact. MSS purchased $20,537,206.20 worth of goods from Hunt between January 1, 2019 and April 25, 2023. Relevant to this case, the goods were used by MSS as a subcontractor in the construction projects identified in the table below.

| Construction Projects | Owner | General Contractor | Construction Contracts |
|---|---|---|---|
| Park View | Park View (Greer), LLC | Clayton Construction Company, Inc. | Clayton Construction Company, Inc. Subcontract between Clayton Construction Company, Inc. ("Clayton") and MSS dated July 28, 2021, relating to the Park View Project. (the "Clayton Construction Contract") |
| Symphony Park | BFG Huntersville PropCo, LLC | Carolina Commercial Contractors, LLC | Subcontract Agreement between Carolina Commercial Contractors, LLC ("CCC") and MSS dated April 4, 2022, relating to the Symphony Park Project (the "2021 CCC Construction Project") |
| Medley at Northwood Landing | Medley at Northwood Landing, LLC | Carolina Commercial Contractors, LLC | Subcontract Agreement between CCC and MSS dated June 26, 2023, relating to the Medley at Northwood Landing Project (the "2023 CCC Construction Contract" |
| Vintage Raleigh West | Vintage Raleigh West Owner, LLC | T.D.K. Construction Co., Inc. | Contract between T.D.K. Construction Co., Inc. ("TDK") and MSS dated October 4, 2021, for the Vintage Raleigh West Project (the "TDK Construction Contract") |

3

| Meridian at Rogers Branch | Meridian at Rogers Branch, LLC | North View Construction, LLC | Standard Form of Agreement Between Contractor and Subcontractor dated August 9, 2021, between NorthView Construction, LLC ("NVC") and dated August 9, 2021, relating to the Meridian at Rogers Branch Project (the "NVC Construction Contract") |

Hunt permitted MSS to purchase supplies, materials, products, and goods on account so long as the outstanding balance owed by MSS thereunder did not exceed $1,000,000 (the "Credit Limit"). At some point prior to 2023, Mr. Jacobs began fulfilling purchase orders from and delivering product to MSS, but he knowingly did not enter concurrent corresponding purchase orders into Hunt's computer invoicing and billing system as required by the terms of account. As a result, MSS did not receive a number of invoices in a timely manner. Because the purchase orders were not entered into the billing system, MSS exceeded the Credit Limit.

Mr. Jacobs' actions in withholding purchase orders from the billing system were not known to MSS until February 2023. On February 10, 2023, Matthew Filzen, Chief Operating Officer of MSS, received a text from Mr. Jacobs, indicating that on its account with Hunt, $249,003.09 was now more than thirty days past due, and a further $311,925.83 was presently due for the month of February. Jacobs also informed Mr. Filzen that these amounts were in addition to about $280,000.00 of invoices Jacobs was "holding" and had not yet entered into Hunt's billing system. The sum of the stated amounts was still within the Credit Limit. However, six days later, on February 16, 2023, Mr. Filzen met with Mr. Jacobs at the MSS office in Durham, where he was presented with a folder containing nineteen more separate sales occurring between May 23, 2022 and August 18, 2022 that had been fulfilled and delivered, but never

4

invoiced (the "Non-Invoiced Transactions"). The Non-Invoiced Transactions totaled $694,426.05 according to Mr. Jacobs.

Mr. Filzen was informed the Non-Invoiced Transactions were being added to the open account, plus accrued interest at the open account rate of 1.5% per month for the intervening past nine months. As a result, Hunt asserted that as of February 16, 2023, the outstanding balance on the MSS open account totaled $1,493,999.04. On March 5, 2023, Mr. Jacobs informed Dallas A. Swain, president of MSS, that officers at Hunt had been made aware of the Non-Invoiced Transactions and a telephone conference to discuss the matter was set up for March 7, 2023. During that telephone conference, R. Samuel Hunt, III, Chairman of the Board of Directors for Hunt, repeatedly demanded full payment from MSS. At some point, Mr. Hunt stated, "You are going to pay me $400,000.00 by Friday or else." MSS obtained a $500,000.00 loan from a third-party (the "McCorkle Funds") and paid $458,445.16 to Hunt on March 10, 2023.

Following the conference and partial payment, Hunt kept up the pressure on MSS to pay the balance and began requiring payment on delivery of goods, rather than invoicing MSS for payment on open account at the end of the month. Mr. Jacobs and Mr. Rodney Sharpe, another employee of Hunt, made daily visits, phone calls, and communications with MSS to demand and pressure repayment for the outstanding balance. In response, MSS made the following payments (including the borrowed McCorkle Funds) in the six weeks following the March 7, 2023 Phone Conference, applying these payments to the Non-Invoiced Transactions first:

| Date | Payment Amount |
|---|---|
| 3/10/2023 | $458,445.16 |
| 3/16/2023 | $126,312.42 |
| 3/24/2023 | $126,312.42 |
| 3/31/2023 | $124,456.18 |
| 4/24/2023 | $122,562.52 |

A second meeting was held in April 2023 (the "April 2023 Meeting") to discuss establishing a plan for repayment of the remaining outstanding balance. Prior to the meeting, Hunt made inquiries with other MSS suppliers such as Capital Lighting & Supply, LLC a/k/a Capital Electric in an effort to discern the credit balance of MSS with other material suppliers. At the April 2023 Meeting, MSS officers sought deferred payment terms so MSS could continue work on the Construction Projects and generate revenue to pay Hunt. Meanwhile, significant amounts of other goods previously ordered by MSS and necessary to complete the electrical portions of the Construction Projects (the "Pending MSS Materials") were scheduled but not delivered.

At some point thereafter, Hunt approached the General Contractors for the Construction Projects and demanded payments be made directly from them for materials, supplies, and products purchased by MSS. Hunt threatened it would cancel and terminate the Pending MSS Materials orders if the General Contractors failed to comply with the direct payment demands. In most instances, the General Contractors paid the demanded amount corresponding to the respective Construction Project. Hunt also filed and asserted several notices of claims of lien and claims of lien under Chapter 44A of the North Carolina General Statutes against MSS and the Construction Projects, thereby creating liens on funds the General Contractors would owe to MSS associated with the corresponding Construction Projects. MSS maintains in a general allegation that Hunt provided false and misleading information to the General Contractors concerning ordering of goods by MSS for the Construction Projects but does not provide detail on which exact information or statements were false and misleading.

Given the account balance discrepancy and assertion of liens on funds and property asserted by Hunt, in the summer of 2023, the following General Contractors cancelled the corresponding Construction Contracts with MSS on the following dates:

| General Contractor | Written Agreement | Termination Date |
|---|---|---|
| Clayton Construction Company, Inc. | Clayton Construction Contract | July 10, 2023 |
| Carolina Commercial Contractors, LLC | 2021 CCC Construction Project | June 28, 2023 |
| Carolina Commercial Contractors, LLC | 2023 CCC Construction Contract | August 17, 2023 |
| T.D.K. Construction Co., Inc. | TDK Construction Contract | July 11, 2023 |
| North View Construction, LLC | NVC Construction Contract | July 6, 2023 |

MSS maintains the cancellation of these contracts pushed it into chapter 11. During the one-year period preceding the Petition Date, Hunt received transfers from third parties attributable to and payments from MSS totaling $2,749,405.15. Three of the payments/transfers totaling $290,053.50 occurred within 90 days of the Petition Date; sixteen payments/transfers totaling $2,459,351.65 were made more than ninety days before the Petition Date.

## LAW AND ANALYSIS

### I. Pleading standard

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see also* Fed. R. Bankr. P. 7008. A complaint that fails to meet this threshold obligation should be dismissed under Fed. R. Civ. P. 12(b)(6) for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause

7

of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly* at 557, 1955). A motion to dismiss must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* Facial plausibility is present when the plaintiff pleads factual content upon which the court can "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.") Importantly, while a court "must take all of the factual allegations in the complaint as true" courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.*

Further, when a complaint sounds in fraud or mistake, the pleading must "state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); *see also* Fed. R. Bankr. P. 7009. The element of intent or scienter, normally being a state of mind existing inside the defendant, is a difficult element to prove, and that portion of the pleadings may be pled in generality. *See In re Howard*, 12–02634–8–RDD, 2013 WL 3725155, at *5 (Bankr. E.D.N.C. July 15, 2013).

II.    **Avoidance and Recovery of Preferential Transfers**

A debtor in possession may "avoid any transfer of an interest of the debtor in property" that was:

1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
    (A) on or within 90 days before the date of the filing of the petition; or
    (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if—

>  (A) the case were a case under chapter 7 of this title;
>  (B) the transfer had not been made; and
>  (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547; 11 U.S.C. § 1107.

The Complaint raises two buckets of transfers, the first consisting of transfers made between ninety days and one year pre-petition insider preference period (the "Insider Preference Claims"); the second consisting of transfers made within 90 days of filing the petition (the "Within 90 Days Claims").

### A. Insider Preference Claims

In order for the Debtor to reach outside of the 90-day preference period, MSS is tasked with demonstrating that Hunt constitutes an insider of the Debtor. The Bankruptcy Code defines an "insider" of a corporation to be a:

>  (i) director of the debtor;
>  (ii) officer of the debtor;
>  (iii) person in control of the debtor;
>  (iv) partnership in which the debtor is a general partner;
>  (v) general partner of the debtor; or
>  (vi) relative of a general partner, director, officer, or person in control of the debtor.

11 U.S.C. §101(31)(B).

MSS does not contend Hunt falls into one of the statutory categories, but rather asserts Hunt is a "non-statutory insider." This label originates from caselaw interpreting Section 101(31) as an illustrative, not exhaustive list. "[A]n insider may be any person or entity whose relationship with the debtor is sufficiently close so as to subject the relationship to careful scrutiny." *Butler v. Shaw*, 72 F.3d 437, 443 (4th Cir. 1996) (quoting *In re Babcock Dairy Co.*, 70 Bankr. 662, 666 (Bankr. N.D. Ohio 1986)). To establish non-statutory insider status, the party "must exercise sufficient authority over the debtor so as to unqualifiably dictate corporate policy

9

and the disposition of corporate assets." *Butler v. David Shaw, Inc.*, 72 F.3d 437, 443 (4th Cir. 1996); *see also Angell v. Meherrin Agric. & Chem. Co. (In re Tanglewood Farms, Inc.)*, Nos. 10-06719-8-JRL, 12-00186-8, 2013 WL 1829910, at *14 (Bankr. E.D.N.C. May 1, 2013). In short, the creditor must almost take over control of the debtor's finances or business.

At the Hearing, MSS contended that because Hunt was the exclusive supplier of MSS, and there would be significant delays if MSS were to seek certain supplies from other sources, Hunt was in a superior position far greater than and beyond the status of a normal supplier. It maintains this control over supplies and payment terms effectively gave Hunt control over MSS and its ability to conduct business after discovery of the billing discrepancies in March 2023 through the cancellation of the Construction Contracts in July and August later that year.

In response, Hunt first notes the Complaint did not allege the existence of an exclusive purchase and sale arrangement in the open account, nor was such an exclusive sales arrangement later sought or otherwise demanded. Nothing in the pleadings indicates that MSS was not free to deal with other suppliers or that Hunt exercised any degree of control or authority over any of the Construction Contracts or work of MSS in fulfilling its duties and work on the Construction Projects.

Even more crucial, nothing in the allegations of the Complaint supports a finding that Hunt controlled the finances of MSS. It did not decide which other vendors got paid, hire or terminate employees, determine which jobs to bid on, or otherwise dictate any degree of control over the day-to-day business of MSS. Per the allegations, what Hunt did was "play hard ball" in its collections process, but that alone is not sufficient to impose non-statutory insider status. If hard-nosed collection tactics were sufficient to impose non-statutory insider status, a large

10

portion of prepetition financially distressed business cases would feature non-statutory insiders; the exception would become the rule.

Because MSS could not allege that Hunt had control over the operations of MSS sufficient to be a non-statutory insider, the Insider Preference Claims asserted by MSS must be dismissed.

### B. Within 90 Days Claims

Hunt additionally moves to dismiss the claim for payments occurring within ninety days of the Petition Date, liability for which does not require insider status. Principally, it seeks dismissal of the largest payment in this time frame, being the direct payment of $275,000 made July 21, 2023 to Hunt by North View Construction, LLC (the "NVC Transfer"), which represented amounts owed to MSS pursuant to the NVC Construction Contract and applied towards the outstanding balance purportedly owed by MSS to Hunt for goods related to the Meridian at Rogers Branch Project. Hunt asserts the NVC Transfer resulted from a timely and properly filed notice of claim of lien on funds and claim of lien filed July 10, 2023. Hunt maintains that because it was a bona fide secured creditor, the NVC Transfer could not be a preference. While this may or may not turn out later to be accurate, Hunt seeks to have the court consider facts outside of the four corners of the Complaint and consider affirmative defenses available under section 547(c) of the Bankruptcy Code that have not been pled and are not yet assertable. It also assumes that the liens asserted under chapter 44A of the North Carolina General Statutes are unassailable, an issue that cannot be determined at this early pleading stage.

Taking the factual allegations in the Complaint as true, MSS has met the plausibility pleading standard as to the Within 90 Day Claims. For these reasons, and those stated on the record, the Within 90 Day Claims survive this stage.

### III. Constructively fraudulent transfers

MSS pleads in the alternative that the Transfers should be avoided as constructively fraudulent under 11 U.S.C. §§ 544 and 548. Under both statutes, MSS limits the claim to constructive fraud rather than actual or common law fraud. To proceed under section 544, MSS must look to application of N.C.G.S. § 39-23.1 *et seq.*, which allows a party to avoid any transfer made or obligation incurred if the debtor: (1) made the transfer or incurred the obligations; (2) without receiving reasonably equivalent value in exchange for the transfer or obligations; and (3) was insolvent at the time or became insolvent as a result of the transfer or obligation." N.C. Gen. Stat. § 39-23.5(a). Section 548(a)(1)(B) provides the same constructive fraudulent transfer analysis for the first two years prior to filing the petition—primarily that the Debtor received less than reasonably equivalent value in exchange for such transfer or obligation—except that he need not show a particular creditor could bring the action. An exception is made for (1) any immediate or mediate transferee of such initial transferee to the extent such transferee "takes for value, . . . in good faith, and without knowledge of the voidability of the transfer avoided;" or (2) any immediate or mediate good faith transferee of such transferee. *See* 11 U.S.C. §550(b).

In this instance, the constructively fraudulent transfer analysis contains the same fatal issue under both the Bankruptcy Code and North Carolina statute. MSS contends it did not receive reasonably equivalent value in exchange for the transfers. However, in the Complaint MSS avers that all of the materials were bought from MSS on open account and the corresponding goods were "furnished to the Construction Projects." (Complaint ¶ 127; see also ¶ 87 "Defendant held an unsecured debt and claim against MSS arising from electrical materials and supplies that were ***previously ordered, delivered, and invoiced for***, *inter alia*, the Construction Projects.") No where in the Complaint does MSS allege it was billed or paid for

goods from Hunt that were never delivered. In fact, the sum of its allegations is that it was delivered many goods that were delayed in billing.

Although the Transfers are not avoidable under a constructive fraud analysis under state and federal law, they still may be deemed avoidable if made to an insider, for an antecedent debt, while the debtor was insolvent, and the insider had reasonable cause to believe that the debtor was insolvent or would become insolvent as a result of the transfer. N.C. Gen. Stat. § 39-23.5(b). However, as shown above, the Complaint does not adequately allege that Hunt is an insider. Consequently, MSS may not proceed against Hunt pursuant to section 544 under this theory either. For these reasons, and those stated on the record, the second claim for relief, avoidance of constructively fraudulent transfers, is dismissed.

## IV. Recovery under 550

The third claim for relief is for the recovery and preservation for the benefit of the bankruptcy estate the sum of money representing the value of transfers avoided as under Sections 544, 547 and/or 548 of the Bankruptcy Code. As discussed above, Claim One has been dismissed as to all transfers except those occurring within the non-insider ninety day window (the Within 90 Day Claims). The same applies to the section 544 and 548 claims constituting Claim Two. Because Claim Two has been dismissed in its entirety, nothing remains from it to roll down into Claim Three. The survival of the Section 550 claim is therefore limited to the Within 90 Day Claims alone, and to the extent Claim Three seeks to recover beyond the same, the excess claims are denied.

## V. Tortious interference with contractual relations

The fourth claim in the Complaint is tortious interference with contractual relations, which, because it is a creature of state tort and contract law, is governed by North Carolina law. To succeed on this theory, a plaintiff must demonstrate:

13

> (1) A valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*United Laboratories, Inc. v. Kuykendall*, 322 N.C. 643, 661; 370 S.E.2d 375, 387 (1988).

In North Carolina, "[i]nterference with a contract is 'justified if it is motivated by a legitimate business purpose, as when the plaintiff and the defendant, an outsider, are competitors.'" *Beverage Sys. Of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 368 N.C. 693, 700 (2016) (quoting *Embree Constr. Grp., Inc. v. Rafcor, Inc.*, 330 N.C. 487 498 (1992). "'If an outsider to the contract has sufficient lawful reason for inducing the breach of contract, he is exempt from any liability, *no matter how malicious in actuality his conduct may be*.'" *Champion Pro Consulting Grp., Inc. v. Impact Sports Football, LLC*, 976 F. Supp. 2d 706, 717 (M.D.N.C. 2013) (emphasis added) (quoting *Robinson, Bradshaw & Hinson, P.A. v. Smith*, 129 N.C. App. 305, 318 (1998) ("A malicious motive makes a bad act worse, but it cannot make that wrong which, in its own essence, is lawful."). Acting without justification "must indicate 'no motive for interference other than malice.'" *Id.* (quoting *Area Landscaping, L.L.C. v. Glaxo-Wellcome, Inc.*, 160 N.C. App. 520, 523 (2003)). "If . . . the defendant is acting for a legitimate business purpose, his actions are privileged." *Peoples Sec. Life Ins. Co. v. Hooks*, 322 N.C. 216, 220-21 (1988) ("If the defendant's only motive is a malicious wish to injure the plaintiff, his actions are not justified.")

For this case to proceed, MSS must allege facts from which the court could find that Hunt did not act within its own legitimate business purposes and had no reasonable justification for its actions. *See Button v. Level Four Orthotics & Prosthetics, Inc.*, 380 N.C. 459, 467-68 (2022). As a result, a motion to dismiss the tortious interference claim under Fed. R. Civ. P. 12(b)(6) "should

14

be granted when the complaint reveals that the interference was justified or privileged." *King v. Chaffin*, 759 F. Supp. 3d 690, 698 (W.D.N.C. 2024), quoting *Champion Pro Consulting Grp., Inc. v Impact Sports Football, LLC*, 976 F. Supp. 2d 706, 717 (M.D.N.C. 2013). Whether the conduct is justified "depends upon the circumstances surrounding the interference, the defendant's motive or conduct, the interests sought to be advanced, the social interest in protecting the freedom of action of the defendant, and the contractual interests of the other party." *Ga. Pac. Consumer Prods., LP v. Von Drehle Corp.*, 618 F.3d 441, 456 (4th Cir. 2010), quoting *Embree,* 330 N.C. at 498. In effect, tortious interference claims often fail because plaintiffs cannot overcome the justification presumption and thereby satisfy the fourth element. *Johnson v. Honeywell* Int'l, Inc., Case No. 3:23-CV-00640-RJC-SCR, 2024 U.S. Dist. LEXIS 240456 at *12.

In addressing this issue, Hunt points to two perceived flaws in MSS' pleading of the tortious interference claim: (1) the Complaint fails to allege Hunt desired and intended to cause the termination; and (2) rather than providing a lack of justification, the Complaint actually supports a finding Hunt's actions were justified by its legitimate business purpose, debt collection. In response, MSS reiterates that "Hunt Electric, following the April 2023 Meeting . . . knowingly, intentionally, and without privilege, justification or excuse, participated ***in conduct*** and ***deployed collection measures and methods*** that were aimed at, and did in fact induce the termination of the [Construction Contracts]." (Response Brief at 35, see also Complaint ¶ 145.).

In an attempt to overcome the presumption of justification, MSS relies upon Hunt's post-April 2023 conduct and collection measures by way of the allegations contained in paragraphs 73, 76, and 77 of the Complaint:

> 73. Utilizing the following as leverage, and upon information and belief, Defendant approached the General Contractors for the Construction Projects,

15

demanding payment of all amounts associated with the materials, supplies, and products that had been purchased by MSS and associated with the Construction Project, including those amounts associated with the Pending MSS Material Orders, or else Defendant would cancel and terminate the Pending MSS Material Orders.

….

76. Defendant, based upon the statement made by Hunt III at the April 2023 Meeting, employed whatever means necessary to collect the remainder of those amounts purportedly owed by MSS, including but not limited to, the following:

> A. Demanding, via phone, written communication, and weekly in-person visits to the MSS Main Office, full payment of the outstanding balance by MSS for materials, goods, products, and supplies that had been purchased from Defendant and utilized/furnished to the Construction Projects;
>
> B. Communicating with, and demanding payment from, the General Contractors associated with the Construction Projects where MSS was performing electrical construction services under the Construction Contracts;
>
> C. Threating to cancel—as a means to secure full payment from MSS and/or the General Contractors associated with the Construction Projects, outstanding orders that had been previously placed for the Construction Projects for electrical supplies and materials, including Meter Bases, which would cause additional and unexpected construction delays due to the shortage and lead times associated with the underlying materials and supplies ordered and yet to be delivered by Defendant; and
>
> D. Refusing to release to MSS materials and supplies that MSS had purchased, for which full payment had been remitted to Defendant and, instead, providing MSS a credit of $13,580.35, towards the outstanding balance owed by MSS; and
>
> E. Filing and asserting claims of lien under Chapter 44A of the North Carolina General Statutes against the Construction Projects and providing notices of lien on funds to the General Contractors associated with those Construction Projects, which prevented payments being made to MSS for electrical services and work performed.

77. Defendant, likewise, and with the intent to deceive the General Contractors, provided false and misleading information concerning MSS's ordering of materials, supplies, and products for the Construction Projects, which suggested and implied that said materials, supplies, and products that were necessary for the Construction Projects had not been, in fact, ordered by MSS.

Complaint ¶¶ 73, 76-77.

North Carolina courts have "interpreted 'induce' to mean 'purposeful conduct,' 'active persuasion, request, or petition.'" *Morris Int'l v. Packer*, 2020 NCBC LEXIS 122 at *27 (N.C. Super. Ct. Oct. 15, 2020). Satisfaction of the *Iqbal/Twombly* standards hinge on whether the factual allegations amount to "more than a sheer possibility" that Hunt participated in purposeful conduct, or active persuasion in the termination of the Construction Contracts without viable justification. The statements contained in the above paragraphs do not pass muster as they are "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal,* 556 U.S. at 678 ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'") This lack of supporting factual contentions in the Complaint prevents the court from reasonably drawing the inference that Hunt induced, through purposeful conduct or active persuasion, request or petition, the termination of the Construction Contracts.

Hunt's actions are deemed privileged where defendant is acting for a legitimate business purpose, namely collecting on the debt, the underlying validity of which (as opposed to the exact amount) is not rationally challenged in the Complaint allegations. This presumption of justification acts as a high bar and gatekeeper to prevent a tortious interference claim from being asserted in every business collection dispute. The general factual allegations contained in the Complaint, including the key paragraphs 73 to 77, lack the requisite factual detail and specific instances of bad behavior by Hunt. These paragraphs only conclusorily allege that Hunt falsely told contractors that MSS had not ordered necessary supplies for the projects, but no actual factual instances of this assertion are relayed, and no explanation of how such activity, if it occurred, overcomes the justification presumption.

To survive the motion to dismiss, MSS must allege facts from which a reasonable factfinder could find that Hunt's overriding motivation was grounded in malice. Because it failed to plead facts sufficient under the *Iqbal/Twombly* standard to overcome Hunt's justification privilege present in a tortious interference claim, the fourth claim for relief must be dismissed.

VI. **UDTPA**

To recover under North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 (the "UDTP Act"), there must be a showing that the "(1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp*, 548 S.E.2d 704, 711 (N.C. 2001). A practice is unfair when it offends established public policy, as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. *Sykes v. Health Network Solutions, Inc.*, 828 S.E.2d 467, 479 (N.C. 2019) ("Bad faith or deliberate acts of deceit do not need to be shown."). A practice is deceptive if it "has the capacity or tendency to deceive." *Exclaim Mktg., LLC v. DirecTV, LLC*, 674 Fed. Appx. 250, 254 (4th Cir. 2016). All the facts and circumstances surrounding a transaction are relevant to determining whether an act or practice is unfair or deceptive. *Id.* "It is well settled under North Carolina law that proof of an independent tort is sufficient to make out a separate claim under the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA")." *In re EBW Laser, Inc.*, 2008 WL 1805575 at *3 (Bankr. M.D.N.C. April, 21, 2008) ("Similarly, allegations in which the plaintiff alleges an independent tort as constituting an unfair and deceptive act are sufficient to allege a UDTPA claim.").

MSS contends the same alleged misrepresentations that resulted in the termination of one or more of the Construction Contracts constitute an unfair or deceptive act or practice. At the Hearing, MSS conceded that the fifth count, the UDTPA claim, can only survive the Motion if

the tortious interference with contract claim lives on as well. (Dkt 20, *PDF with Attached Audio File* at 00:46:19.) As noted above, the alleged misrepresentations which comprise the tortious interference with contractual relations claim did not contain sufficient factual support to survive the pleading standards of *Iqbal/Twombly*. Consequently, the Fifth Claim for Relief for UDTPA violation must be dismissed as well.

## CONCLUSION

For the foregoing reasons, Defendant's Motion is GRANTED IN PART and DENIED IN PART, and it is HEREBY ORDERED as follows:

1. On the First Claim for Relief seeking Avoidance and Recovery of Preferential Transfers, the Motion is GRANTED as to the sixteen transfers constituting the Insider Preference Claims but DENIED as to all Within 90 Days Claims.

2. On the Second Claim for Relief, seeking alternatively Recovery and Preservation for the Benefit of the Estate, the Motion is GRANTED.

3. On the Third Claim for Relief seeking Recovery and Preservation for the Benefit of the Estate under Bankruptcy Code Section 550, the Motion is GRANTED in part and DENIED in part, consistent with the treatment of paragraphs 1 and 2 above.

4. On the Fourth Claim for Relief for Tortious Interference with Contractual Relations, the Motion is GRANTED.

5. On the Fifth Claim for Relief for Violation of the North Carolina Unfair and Deceptive Trade Practices Act (N.C.G.S. § 75-1.1 et seq.), the Motion is GRANTED.

6. The Defendant is allowed thirty (30) days from the date of this Order to file an answer regarding the surviving Within 90 Days Claims.

**END OF DOCUMENT**